JOHN MOHR & SONS, Plaintiff-Appellee,

v.

APEX TERMINAL WAREHOUSES, INC. and O. W. Martin, Defendants-Appellants.

No. 17434.

United States Court of Appeals, Seventh Circuit.

Feb. 11, 1970.

Rehearing Denied March 30, 1970.

---

Thomas W. Munger, J. Frederick Hoffman, Lafayette, Ind., for defendants-appellants.

George T. Schilling, James V. McGlone, of Stuart, Branigin, Ricks & Schilling, Lafayette, Ind., for plaintiff-appellee.

Before MAJOR, Senior Circuit Judge, and FAIRCHILD and KERNER, Circuit Judges.

MAJOR, Senior Circuit Judge.

This diversity action was instituted on August 18, 1967, by John Mohr & Sons (hereinafter called plaintiff or Mohr), as lessor, against Apex Terminal Warehouses, Inc. (hereinafter called Apex or the corporate defendant), as lessee, to recover rent, damages for injury to property and attorney's fees under a grain terminal lease dated November 4, 1965, effective as of October 1, 1965. The same recovery was sought against the president and owner of Apex, O. W. Martin, by virtue of a contemporaneous written guarantee of the Apex obligations.

Diversity jurisdiction was challenged by both defendants, and Apex sought damages by way of a counterclaim for property installed by it during its tenan-cy but which Mohr claimed and took possession of on reentry.

The case was tried to the court without a jury, and the court concluded (1) that diversity jurisdiction existed as to both defendants; (2) that Mohr was entitled to recover $30,000 of unpaid rent, $4,259.25 attorneys' fees and $540 damages for loss or injury to property (this item not involved on this appeal), and (3) that Apex was not entitled to recover on its counterclaim.

Judgment in favor of Mohr was entered accordingly, from which Apex and Martin, after denial of their motion for a new trial, appeal to this court.

The case was tried by Honorable Jesse E. Eschbach, a United States District Judge, who rendered a lengthy opinion in which he discussed every facet of the case and expressly stated that the opinion contained his findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

The trial judge considered a large amount of testimony, both documentary and oral, much of the latter of a controversial nature. It was his function to resolve conflicts in the testimony and make findings of fact. A study of defendants' presentation here shows that they have largely ignored the findings of the trial court and would have us substitute our judgment instead. This, of course, as has often been stated, is not within the province of a reviewing court. In the recent case of Brennan v. Midwestern United Life Insurance Co., 7 Cir., 417 F.2d 147, 149, we stated:

"Our function is to ascertain, after considering the record in its entirety, whether the inferences drawn by the trial judge have a sufficient evidentiary basis so that it can be said they are reasonable, that is, could have been arrived at by logical deduction. In performing that function, we may not resolve testimonial conflicts or attempt to judge the credibility of witnesses."

A study of the record is convincing that the findings contained in Judge

Eschbach's excellent opinion (not published) are adequately supported and must be accepted by this court. We also agree with his conclusions of law predicated upon the facts as found.

The contested issues as stated by defendants are:

"1. Whether the district court erred in holding that it had jurisdiction of this case based on diversity of citizenship of the parties.

"2. Whether the district court erred in permitting the plaintiff to recover judgment on the instruments sued on.

"3. Whether the district court erred in denying defendant Apex recovery on its counterclaim for the reasonable value of its trade fixtures converted by plaintiff to its own use."

It is our judgment that we can do no better than adopt as the opinion of this court that portion of Judge Eschbach's opinion which is relevant to the issues as presented. It is as follows:

## I.

Lafayette Grain Terminal, Inc. (hereinafter LGT Inc.), an Indiana corporation, owned the terminal in question in 1961. LGT Inc. was owned one-half by a Mr. Barnes and his family and one-half by plaintiff, which acquired its interest in 1961. At that time, Barnes and his son were two of the four directors. In 1963, Barnes and his son resigned and two officers of plaintiff were elected to the board of directors. It appears that holding these two directorships was sufficient to control the affairs of the corporation. When plaintiff's officers were elected, an employee of plaintiff was assigned to Lafayette to manage the terminal.

In 1964, mortgagees of the terminal buildings instituted foreclosure proceedings against LGT Inc. An insurance company held the first mortgage and plaintiff the second. Plaintiff was the successful bidder at a United States marshal's foreclosure sale and became the record owner of the warehouse on September 8, 1964, by virtue of a marshal's deed. Plaintiff took, however, subject to the insurance company's first mortgage. After the foreclosure but before the lease of the warehouse to Apex, plaintiff operated it as "LGT Inc., a Division of John Mohr & Sons."

Since the foreclosure in 1964, LGT Inc. has been dormant. The day after the sale, it had no assets except a few accounts receivable, and the accounts payable exceeded the value of these assets. Plaintiff assumed these assets and paid the liabilities. LGT Inc. has not subsequently earned any income.

On the basis of these facts, defendants assert that the court is without jurisdiction. Their position is that plaintiff, an Illinois corporation, and LGT Inc. effected a type of "merger" so that the Indiana citizenship of LGT Inc. must be attributed to plaintiff with the result that diversity is destroyed. More specifically, the defendants urge that a *de facto* merger took place or that LGT Inc. should be regarded as the mere alter ego of the plaintiff. The court finds that under neither of these theories urged upon it is it proper to find that diversity is absent.

■■■ As defendants contend, a consolidated corporation may, under certain circumstances, be found to have the citizenship of each of the pre-consolidation, separate, corporate components. *E. g.,* Williams v. New York Cent. R. R., 125 F.Supp. 842 (N.D.Ind.1954). However, the instant case does not permit such a conclusion. Generally, a *de facto* merger has taken place if the conditions of *de facto* incorporation have been met. 15 Fletcher, Private Corporation Sec. 7155 (Perm.Ed.Rev.Vol.1961). For there to be a *de facto* corporation, there must be a statute which authorizes its existence, a bona fide attempt to comply with the requirements of the authorizing statute, and a use of the would-be corporate form. Farmers' Mutual v. Reser, 43 Ind.App. 634, 88 N.E. 349 (1909); 8 Fletcher, Private Corporations Sec. 3798 (Perm.Ed.Rev.Vol.1966). Here, it is plain from the evidence that at least one

of these elements is missing. There is absolutely no evidence that plaintiff or LGT Inc. ever intended to or took any steps to accomplish a merger.

Neither is there any merit to defendants' urging that the alter ego doctrine be applied. To support the defendants' contention, the court would be required to disregard the plaintiff and look to LGT Inc., the Indiana citizen. Yet LGT Inc. has been dormant for nearly four years. To look *through* LGT Inc. to the plaintiff would be more plausible, but this would not help the defendants because plaintiff is clearly an Illinois corporation.

More fundamentally, this is simply not an appropriate occasion to apply alter ego reasoning. Before the doctrine may be applied,

> "* * * it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud."

1 Fletcher, Private Corporations Sec. 41.1 (Perm.Ed.Rev.Vol.1963). It cannot be said that LGT Inc. has been such an instrumentality for plaintiff. LGT Inc. has been totally inactive for four years *and has not been an instrumentality for anyone.* While it is true that the two corporations had interlocking directorates and management before the foreclosure in 1964, the affairs of the two firms were kept separate. For example, before the foreclosure, the employee that plaintiff sent to manage the warehouse was paid by LGT Inc. After foreclosure, *he was paid by LGT, Division of John Mohr & Sons.* There was a similar change in bank accounts.

■ The distinction between LGT Inc. and its principal asset, the terminal, must be kept clear. The fact that plaintiff acquired this asset does not mean that the affairs of the two corporations became intermingled. Plaintiff acquired the terminal through an arm's length transaction at a United States marshal's sale. At all times, plaintiff's interest in the property, either as a lien holder or as record owner, was subject to the rights of a first mortgagee.

Finally, it cannot be said that treating the two corporations as separate entities would promote injustice or fraud. This would be a much different case if, for example, LGT Inc. had created the plaintiff solely for the purpose of creating diversity. See, *e. g.,* Miller & Lux, Inc. v. East Side Canal & Irrigation Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189 (1908). This is not the situation here.

### II.

■ On November 4, 1965, a two-year lease of the terminal and its contents was executed between plaintiff and the defendant corporation. Plaintiff seeks to recover unpaid rent which was due it under the lease. Three installments of $10,000 each, due respectively on January 1, 1967, April 1, 1967, and July 1, 1967, for a total of $30,000, were not paid. Defendant does not seriously contest the alleged default in these rent payments. In addition, both defendants were requested to admit the fact of nonpayment by plaintiff's Request for Admissions, filed November 22, 1967, but they do not respond. As defendants' attorney conceded at the trial, they had notice of the requests, and their failure to answer was intentional. Therefore, the fact of nonpayment must be deemed admitted under Fed.R.Civ.P. 36. * * *

### III

■ Plaintiff claims the right to recover reasonable attorney's fees for the prosecution of this action and relies on Paragraph 19 of the lease to support that right. Paragraph 19 reads as follows:

> "19. *Advances.* In the event of any breach hereunder by Tenant, Landlord may immediately or at any

time thereafter, without notice, cure such breach for the account and at the expense of Tenant. If Landlord at any time by reason of such breach is compelled to pay or elects to pay any sum of money or do any act which will require the payment of any sum of money, or is compelled to incur any expense, including reasonable attorney's fees, in instituting or prosecuting any action or proceeding to enforce Landlord's rights hereunder, the sum or sums so paid by Landlord shall be paid by Tenant to Landlord on the first day of the month following the payment of such respective sums or expenses."

Plaintiff is entitled to recover the sum of $4,259.25, which was paid plaintiff's attorney for the prosecution of this action. These charges were based on the fee schedule of the Tippecanoe Bar Association (Lafayette, Indiana), which schedule was stipulated to be reasonable.

The language which permits plaintiff to recover is " * * * If Landlord at any time by reason of such breach * * * is compelled to incur any expense, including reasonable attorney's fees, in instituting or prosecuting any action or proceeding to enforce Landlord's rights hereunder * * * [then Tenant must reimburse Landlord]." "Such breach" refers to "any breach" from the previous sentence. The instant action was instituted to enforce plaintiff's right to receive rent. The right to receive rent is a "right hereunder," and plaintiff is entitled to recover the attorney's fees for the suit.

On June 18, 1968, the defendants filed a motion to strike the plaintiff's allegations with respect to attorney's fees because of the plaintiff's failure to give a proper answer to a certain interrogatory. The court has considered this motion and finds it to be without merit.

## IV.

The next question is whether plaintiff may have a judgment against the individual defendant, O. W. Martin, as well as against the corporate defendant,

Apex. Martin is the sole shareholder of Apex, and he and his wife are two of the three directors.

Serious negotiations for leasing the terminal began in the summer of 1965. Mr. Martin had two or three conferences with Mr. Marsh, who was the executive vice president, treasurer, and a director of plaintiff corporation. After a final meeting in Marsh's office, letters of intent were exchanged, and these letters became the basis for the lease which was drafted by plaintiff's attorney. The lease was executed on November 4, 1965, in plaintiff's office in Chicago. At the same time and place, Martin signed a guaranty agreement and accepted an option to purchase the terminal. Apex, however, had actually taken possession of the warehouse around the first week of September. The reason for permitting Apex to take possession prior to November 4 was that the peak of the grain season was rapidly approaching, and Apex was naturally eager to begin operations. Plaintiff agreed to the early possession and delivered the terminal keys to Apex. In Martin's Trial Memorandum, it is asserted that the first request to Martin to guarantee the lease was made to him on November 4, 1965, the day the lease was signed; that Apex had already taken possession of the property and paid the first installment of rent; that Apex was already obligated to lease the property, and that therefore there was no consideration for the guaranty agreement.

The clear weight of the evidence, however, is to the contrary. The court finds that very early in the negotiations, it became established that Mr. Martin would guarantee the lease. It appears that at the conference between Mr. Marsh and Mr. Martin, Marsh suggested that Martin and his wife guarantee the lease. Martin objected quite strenuously to his wife's signing any such agreement, but indicated that he would be willing to do so. That this was the understanding is strengthened by the fact that the letter of intent from Marsh to Martin, dated September 16, 1965, which

644

embodies their discussion in Marsh's office, was signed by Martin two times, once as president of Apex and once in his individual capacity. A second letter of intent, dated September 20, 1965, which incorporated minor changes made by Martin in the first letter, was also signed by Martin in both capacities.

▮▮ Thus the court finds that the lease and the guaranty agreement were executed at the same time and place and became effective and binding at the same time. Under Indiana law, the principal contract (the lease) is sufficient consideration for the guaranty contract provided the guaranty contract is made at the same time as the principal contract to which it relates. Singer Mfg. Co. v. Forsythe, 108 Ind. 334, 9 N.E. 372 (1886).

The guaranty agreement permits plaintiff to recover against Martin for both the unpaid rent and damage to the leasehold. Martin agreed to guarantee the "full * * * payment, when due, of all rent * * * and the full, prompt, and unconditional performance and observance of every covenant, agreement, term and condition of said lease * * *." There can be no question that this provision makes Martin liable to plaintiff for every item for which plaintiff is entitled to recover under the lease and the issues of this case.

▮ Defendants, however, claim the plaintiff is not entitled to *any* recovery. Their basis for this contention is that the letter of intent dated September 20, 1965 is the entire agreement between the parties and that the lease and other documents executed on November 4, 1965 are void. This argument is not supported by the evidence.

If from all the evidence it can be said that it was the intention of the parties that the letter contained the full and complete agreement, the fact that a "formal lease"—a mere memorandum or memorial of the terms on which the parties had already agreed—was to be executed at a later time would not have prevented a binding agreement from coming into existence on September 20, 1965. On the other hand, if the letter was but a part of the negotiation process and the parties did not intend to be bound except by the terms of a "formal lease," then the letter would represent nothing but a statement of the basis for a legally effective agreement. International Shoe Co. v. Lacy, 114 Ind.App. 641, 53 N.E.2d 636 (1944); Avery v. Citizens' Loan & Trust Co., 94 Ind.App. 161, 180 N.E. 23 (1932). The evidence in this case supports the latter construction.

If Martin had believed that the letter of September 20 was the entire agreement, it would be expected that he would have expressed surprise later when he received a draft of the documents which were executed on November 4. It would also be expected that he would sign those documents with reluctance, if at all. There is absolutely no evidence supporting Martin's having such a belief. He inspected the drafts and signed them with not a single word of protest. Further, the parties all along intended that the final agreement would be drafted by their attorneys. The letters of intent were drafted by the parties themselves and, in express language, anticipated the preparation of a complete formal agreement by attorneys.

### V.

▮ Defendant Apex has counterclaimed for an alleged conversion of certain property it installed in the terminal. According to Apex, it installed two different types of equipment. It is important for Apex to make such a distinction since, under Paragraph 8 of the lease, Apex had obligations with respect to the installation of a certain type of equipment. That paragraph reads in part:

"* * * it is agreed that the Tenant * * * is obligated to install * * * at its sole expense * * * down legs and equipment for handling grain at a *minimum* cost of $20,000. * * * Such equipment shall become the property of the Landlord at

the expiration or termination of the lease." (Emphasis added.)

Thus, defendant contends that only $29,000 worth of nearly $80,000 worth of equipment that it installed is "grain handling equipment" (hereinafter HE). The balance is asserted by defendant to be "grain processing equipment" (hereinafter PE) to which no reference is made in the lease and which did not become the property of the plaintiff under the terms of the lease. The court finds that all the equipment installed by Apex is covered by Paragraph 8 and that a distinction between HE and PE was never intended by the parties, but, rather, was an afterthought of the defendant. Defendant in practical effect contends for a distinction without a difference.

Into the HE category, Apex would put (1) a 129-foot elevator leg, (2) a 20-foot truck grain dump pit and motor, (3) a distributing head and spout openings, (4) a 90-foot horizontal conveyor, (5) 60 feet of horizontal, 10-inch auger and superstructure, (6) 46 feet of transverse, 10-inch auger, (7) 90 or 100 feet of inclined, 10-inch auger, (8) a railroad grain dump, and (9) gate valves. Into the PE category Apex would put (1) an 80-foot elevator leg and multiple head, (2) two 1,000-bushel garnering bins, (3) two dryers, (4) two cooling bins, (5) an auger conveyance, (6) steel superstructure, and (7) a concrete apron. This attempted classification into HE and PE is, however, little better than arbitrary. Elevator legs, augers, distributing heads, and superstructure appear in both categories. The difference between, for example, an elevator leg that "handles" and one that "processes" was not explained to this court and none is apparent. Therefore, if the equipment in the first group is "equipment for handling grain," and Apex admits that it is, the equipment in the second group must also be considered "equipment for the handling of grain." It belongs to the plaintiff under Paragraph 8 of the lease.

It requires no stretching of the word "handling" to determine that all the equipment in the second category, the alleged processing equipment, enables a grain terminal to "handle" more grain or to "handle" it more efficiently. The elevator leg, auger conveyance and supporting superstructure are "handling equipment" in the sense that they move grain from one part of the terminal to another. The concrete apron facilitates handling by providing more convenient arrival and unloading of trucks which transport grain. The garnering bins, dryers and coolers permit more grain to be handled by the terminal. Wet grain causes a terminal serious problems. The dryers eliminate those problems. The coolers expedite grain "handling" by speeding the over-all drying process.

If the PE-HE distinction was in effect, as Martin claims, it is difficult to understand why Apex delayed so long in claiming this property or in voicing this distinction to plaintiff or its agents. On August 4, 1967, Apex received a letter from the plaintiff's attorneys to the effect that if Apex did not pay the back rent by August 16, plaintiff would sue. On August 17 or 18, Apex received a telegram from plaintiff's attorney indicating that plaintiff had terminated the lease and ordered the commencement of a suit. The suit was in fact filed on August 18, 1967. Again, on October 4, 1967, in plaintiff's offices, the defendant, Martin, was told by the president of plaintiff that the lease was terminated. At this time, Martin was also told to vacate the premises. Yet the first time, other than the vague reference to "trade fixtures" in its answer of December 12, 1967, Apex made any effort to reclaim the "PE" was on January 15, 1968, well after the commencement of this action, when it sent its agent Rogers to the terminal to remove "all equipment" installed by Apex. Plaintiff's agents, who were present, refused the request or demand.

Mr. Martin, however, testified that during the negotiation stage, he had a conversation with Mr. Marsh at the site of the warehouse, during which they discussed what equipment would be in-

stalled. According to Martin, the discussion was fairly specific and the HE-PE distinction was made. The weight of the evidence is contrary. Martin also gave testimony from which he would request the court to draw the inference that plaintiff encouraged him not to remove the equipment. One of plaintiff's officers is alleged, on October 4, 1967, to have encouraged Martin to continue his efforts to obtain financing so that Martin could exercise the option to purchase the terminal. The plaintiff's officer denied this, however, and asserted that he did not have any conversation with Martin on that day about the option. He went on to testify that to the best of his knowledge there was no conversation between Martin and anyone from plaintiff after October 4, 1967, concerning a sale of the property to Apex.

The evidence from which the conclusions as to the parties' intentions have been drawn was supplemented by other evidence which shows the general context in which the parties were acting. Ever since plaintiff acquired the warehouse in 1964, it had lost money, and during the summer of 1965 it was closed. The reason for its poor record was that it was seriously underequipped. As both Martin and the vice president of Apex, Mr. Fulmer, testified, when Apex took over, the warehouse was "inoperable." Fulmer described it as a "high cost handling house" and stated that no major grain company would take it. While it is true that a grain storage terminal could operate without the "PE" installed by Martin, especially the dryers and coolers, it is clear that such a terminal would be at a serious disadvantage. Wet grain will spoil and could start a fire. This spoilage can occur within three days. It was to correct this condition of the terminal that the parties agreed that Apex would install grain handling equipment. Paragraph 4 of the lease gives support to this interpretation of the purpose of the installation. Apex agreed to operate a grain storage terminal, to conduct the business in a reputable manner, and "to use its best efforts to produce the maximum amount of grain storage possible."

But what Martin and Apex had in mind went far beyond this. During the two-year term of the lease, Apex also held an option to buy the terminal and spent considerable effort during the entire term to obtain financing for the purchase. Indeed, it appears that as late as the fall of 1967, shortly before the lease was terminated and after Apex was in default on three rent installments, Martin was still seeking financing. Thus, it must be concluded that Martin was installing equipment not with an eye to what he must do to perform his obligations as tenant, but with an eye to owning the entire facility. His goal was to make the warehouse a first class grain storage facility. All equipment installed by Apex was "equipment for the handling of grain" under the lease and became the plaintiff's property.

Therefore, plaintiff is entitled to judgment against both defendants in the amount of $34,799.25, and defendant Apex is not entitled to recover on its counterclaim.

As heretofore noted, we hold that the findings of fact contained in Judge Eschbach's opinion are adequately supported and that he reached the correct result.

The judgment appealed from is

Affirmed.