115 N.J. Super. 391 (1971)
279 A.2d 895
SWIFT & COMPANY, A CORPORATION, PLAINTIFF-APPELLANT,
v.
ERWIN SMIGEL, EXECUTOR OF THE ESTATE OF JOSEPH OSCAR SMIGEL, ALSO KNOWN AS JOSEPH ASHER SMIGEL, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1971.
Decided July 15, 1971.
*392 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Sidney Krieger argued the cause for appellant.
Mr. John J. Baldino argued the cause for respondent (Messrs. Calissi, Gelman, Cuccio & Klinger, attorneys).
The opinion of the court was delivered by CONFORD, P.J.A.D.
Plaintiff Swift & Company instituted an action in the Superior Court against Erwin Smigel, executor of the estate of Joseph O. Smigel, for *393 $8,509.60, the amount of merchandise it supplied the Pine Haven Nursing Home & Sanitarium, Inc. ("Pine Haven") upon credit. Plaintiff held continuing guaranties by decedent Smigel and third-party defendant Abe Kraig for payment of the indebtedness. The trial court granted defendant Erwin Smigel's motion for summary judgment, and entered judgment dismissing Swift's complaint and Smigel's third-party complaint against Kraig. Swift appeals from that judgment.
The action of the trial court was predicated upon Joseph Smigel's adjudication as an incompetent prior to the delivery of any of the merchandise for which claim is here made, and upon the authority of the supposed rule that mental incompetency of an offeror prior to acceptance by the offeree terminates the offer whether or not the offeree had notice of the incompetency at the time of the acceptance. Restatement, Contracts, § 48 at 56 (1932). The justification for any such rule, which has not heretofore been passed upon in any reported New Jersey case, is the main question before us for resolution.
The undisputed facts which emerge from the pleadings, motion papers, briefs and oral argument are these. To induce plaintiff to sell provisions to Pine Haven, the two equal owners of its stock, decedent Smigel and one Abe Kraig, on November 11, 1962 each entered into a written agreement of "continuing guaranty" with plaintiff undertaking to pay at maturity all indebtedness of Pine Haven for goods to be sold and delivered to it by plaintiff. Among other provisions, the agreement signed by Smigel purported to cover all liabilities the buyer might incur until ten days after receipt of notice from the guarantor or his legal representatives of withdrawal of the guaranty. No notice of withdrawal was ever given by Smigel or his representatives. Plaintiff asserts, and for the purpose of this appeal it must be accepted as a fact, that it never had knowledge of Smigel's incompetency during the period of delivery of the merchandise giving rise to the present claims, or previously.
*394 We are without information on the basis of which it could be determined whether plaintiff reasonably should have known or been put on inquiry of facts which would have disclosed Smigel's incompetence. Smigel was adjudicated incompetent January 16, 1966, and letters of guardianship were issued to his son, the present defendant, on February 1, 1966. The unpaid-for merchandise was delivered during the period from January 4, 1967 to October 12, 1967. What the course of deliveries and payments therefor previously may have been is not disclosed by the record.
Smigel died November 19, 1967. Pine Haven filed a petition under Chapter XI of the Bankruptcy Act on December 20, 1967. Plaintiff made a claim against the decedent's estate, which was rejected, whereupon this action was instituted.
Defendant's third-party complaint against Kraig and one defense to the complaint are based on the allegation that the goods in question were not delivered to Pine Haven but to a newly organized enterprise owned by Kraig. The merits of this claim were not involved in the decision of the court to enter the summary judgment.
Neither of the parties to this appeal disputes that the agreement upon which this action was brought was a continuing guaranty of the kind "which is not limited to a particular transaction * * * but which is intended to cover future transactions." See Fidelity Union Trust Co. v. Galm, 109 N.J.L. 111, 116 (E. & A. 1932). A continuing guaranty is at its inception an offer from the guarantor and is accepted by the creditor each time the latter does a specified act (e.g., extending credit to the debtor). Typically, as here, such a guaranty reserves in the guarantor the power to revoke it unilaterally prior to action by way of acceptance by the creditor. 38 Am. Jur.2d, Guaranty, § 63 at 1064.
The specific question which concerns us here  whether an adjudication of mental incompetency of a guarantor operates automatically to revoke a continuing guaranty  has not been decided in any American case disclosed by research *395 of the parties or our own. An English trial court decided that the continuing efficacy of the guaranty ceased only when the creditor became aware of the guarantor's insanity. The issue, however, was not involved in the reported appeal. Bradford Old Bank v. Sutcliffe, 2 K.B. 833 (Ct. App. 1918).
The treatment of the question in the texts has been subsumed under the assumed analogy of death of the guarantor. Most of the few decided cases on the latter point have held that death terminates the guaranty without regard to knowledge by the creditor, on the purported general principle that the death of an offeror destroys one of the two essential assenting entities to a contract. See 10 Williston, Contracts (Jaeger-3d ed. 1967) § 1253 at 809-810; 1 id. § 62 at 206-207 (1957); Restatement, Contracts, § 48 at 56 (1932); Restatement, Security, § 87 at 250-252 (1941). A New Jersey trial court followed the general rule. Teplitz Thrown Silk Co. v. Rich, 13 N.J. Misc. 494, 179 A. 305 (Cir. Ct. 1935). Other typical such cases are Jordan v. Dobbins, 122 Mass. 168 (Sup. Jud. Ct. 1877); Aitken v. Lang, 106 Ky. 652, 51 S.W. 154 (Ct. App. 1899). The leading case to the contrary is Gay v. Ward, 67 Conn. 147, 34 A. 1025 (Sup. Ct. Err. 1895), which stressed the diminished business utility of continuing guaranties if terminable without notice on death. Professor Corbin treats that case as representative of the preferred rule. 1 Corbin, Contracts (1963) § 54 at 229. See infra.
The conceptual underpinning of the notion that an offer should be deemed automatically revoked upon death or insanity of the offeror despite good-faith action by way of acceptance thereof by an unknowing offeree has been criticized by the leading writers on the subject.
Corbin comments:
It is very generally said that the death of the offeror terminates the offeree's power of acceptance even though the offeree has no knowledge of such death. Such general statements arose out of the earlier notion that a contract cannot be made without an actual meeting of *396 minds at a single moment of time, a notion that has long been abandoned. The rule has also been supposed to follow by some logical necessity from the dictum that it takes two persons to make a contract. It is not contrary to that dictum to deny that death terminates power to accept; the offer was made by a living man and is accepted by another living man.

* * * * * * * *
It has even been held, and justly, that the doing of the requested acts after the death of the offeror, but in ignorance thereof, consummates a contract. Thus, where through an agent an offeror orders the shipment of goods to the agent, and the offeree ships the goods in ignorance that the offeror has died, the offeree can collect the price from the offeror's estate. So, also, where one has given his promise to guarantee payment for goods to be sold, money to be lent, or service to be rendered to another, the sale or loan or service in ignorance of the promisor's death has been held to enable the promisee to enforce the promise of guaranty against the guarantor's estate. Some cases have held the contrary, however; and also it has been held that the offeree can not accept after he has knowledge that the offeror is dead. [1 Corbin, op. cit., § 54 at 227-228, 229; emphasis added]
The case for terminating the offer on subsequent insanity of the offeror without knowledge of the offeree is found by Corbin "even more doubtful than the rule as to the offeror's death" as "[i]nsanity is far less easily determinable as a fact than is death, either by the contracting parties themselves or by a court." Id. at 231.
Williston observes:
Strong arguments have been advanced that, under the modern view of the formation of contracts which makes the expression of mutual assent the determining factor, notice of death should be required to end the offer, since until notice the apparent effect of the offer continues. A statute, however, would undoubtedly be necessary to bring about this result. [1 Williston, op. cit., § 62 at 207]
and also:
In all probability, insanity of either party would, more than a century ago, having been treated in the same way as death; but since the middle of the nineteenth century there has been a growing recognition of the capacity of insane persons to make contracts, at least under some circumstances, based on the apparent effect of the insane person's conduct and on the ignorance of any impropriety in the transaction by the other party. [Id., § 62A, at 208]
*397 It is noteworthy, in the same vein, that the American Law Institute, although retaining in proposed Restatement, Contracts 2d (Tent. Dr. No. 1, 1964) the substance of section 48 of the Restatement, terminating an offeree's power of acceptance when the offeror (or offeree) dies or is deprived of legal capacity to enter into the proposed contract, apparently does so reluctantly and critically. Comment (a) to section 48 in Restatement 2d, reads:
Death of offeror. The offeror's death terminates the power of the offeree without notice to him. This rule seems to be a relic of the obsolete view that a contract requires a "meeting of minds," and it is out of harmony with the modern doctrine that a manifestation of assent is effective without regard to actual mental assent. See § 21. Some inroads have been made on the rule by statutes and decisions with respect to bank deposits and collections, and by legislation with respect to powers of attorney given by servicemen. See Uniform Commercial Code § 4-405; Restatement of Agency Second § 120 and Comment a. In the absence of legislation, the rule remains in effect. [Emphasis added]
See the comparable criticism of the rationale of the principle of automatic revocation of offers on death or insanity of the offeror in Oliphant, "Duration and Termination of on Offer," 18 Mich. L. Rev. 201, 209-211 (1919), and in Note, 24 Colum. L. Rev. 294 (1924), in both of which that rule is found to violate the reasonable expectations of an offeree without knowledge of the offeror's death or other disability. In the latter the observation is made:
Contract and tort liabilities pass to personal representatives. Why not liability under an offer? If we adopt a test objective as to the offeror and ask, "What is the scope of the offeree's reasonable expectation?," it would seem that notice of the death should be required to terminate the offer. [at 295]
In view of the foregoing criticisms of the conventional approach, which strike us as persuasive, we are not disposed, in determination of this first-instance litigation on the point, routinely to follow existing standard formulations on the *398 subject. The search should be for the rule which will accord with the reasonable expectations of persons in the business community involved in transactions of this kind. In that regard, moreover, we bear no responsibility in this case for determining the rule in the case of death of the guarantor but only in that of his adjudication of incompetency. There may be material differences in the respective situations, as noted in the excerpt quoted from Corbin, supra. Furthermore, our New Jersey cases on the effect of insanity on contract liability, as will be seen infra, also call for a special approach to the guaranty question in the insanity context.
In broad terms, the law of contracts has been said to "attempt[s] the realization of reasonable expectations that have been induced by the making of a promise." 1 Corbin, op. cit., § 1 at 2. In the present instance decedent promised plaintiff to make good any bills for provisions incurred by a corporate business enterprise in which he had a one-half stock interest. Had he not done so plaintiff presumably would not have taken on the business risk of selling to the corporation. It would seem to us that if plaintiff neither knew nor had any reason to know of decedent's later adjudication as an incompetent during any portion of the time it was making the deliveries which gave rise to the debts here sued on, plaintiff's reasonable expectations based on decedent's original continuing promise would be unjustifiably defeated by denial of recovery.
If the situation is judged in terms of relative convenience, it would seem easier and more expectable for the guardian of the incompetent to notify at least those people with whom the incompetent had been doing business of the fact of adjudication than for the holder of a guaranty such as here to have to make a specific inquiry as to competency of the guarantor on each occasion of an advance of credit to the principal debtor. Cf. Gay v. Ward, supra, 34 A., at 1026.
We have thus far been considering the problem presented on the theory that decedent's accountability should soundly be appraised on the basis of reasonable expectations and *399 reliance of others stemming from his act of execution of the guaranty. On that approach, his subsequent incompetency would be irrelevant, for he was competent when he acted. The theoretical basis for the conventional view of automatic termination of the continuing guaranty on insanity, however, is that there is a renewal of the offer on each occasion of acceptance thereof by the offeree, and that renewal cannot be effected by one without legal capacity at the time. See Note, 24 Colum. Law Rev., op. cit., at p. 295. But even if we adhered to that concept of the jural conduct of the guarantor in a continuing guaranty, immunity of defendant in the present situation as a matter of law would not square with existing New Jersey cases as to the liability of persons who, lacking mental capacity, contract with others having no knowledge of that fact and parting with valuable consideration.
In Manufacturers Trust Co. v. Podvin, 10 N.J. 199, 207-208 (1952), the court approved the rule declared in the early case of Drake v. Crowell, 40 N.J.L. 58, 59 (Sup. Ct. 1878) to the effect that
The law in this state is settled, that contracts with lunatics and insane persons are invalid, subject to the qualification that a contract made in good faith with a lunatic, for a full consideration, which has been executed without knowledge of the insanity, or such information as would lead a prudent person to the belief of the incapacity, will be sustained.
The qualification stated was applied by the court in the Drake case in favor of an unknowing party dealing with the alleged incompetent. In accord, South Orange Trust Co. v. Hartley, 29 N.J. Super. 58, 60 (Ch. Div. 1953).
It is thus clear that whatever view is taken as to the appropriate theoretical basis for determining the decedent's liability in this fact pattern, the decisive consideration should be the presence or absence of knowledge by plaintiff, actual or reasonably to be imputed, of decedent's incompetency at the time of each advance of credit pursuant to the guaranty.
*400 Moreover, if at the trial plaintiff's knowledge is established by defendant, the issue of decedent's incompetency would not necessarily be concluded by proof of the fact of adjudication of incompetency. The decisions in this State leave no doubt that that fact is not conclusive but only prima facie evidence of legal incompetency. Eckman v. Wood, 108 N.J.L. 105, 108 (E. & A. 1931); American National Red Cross v. Lester, 129 N.J. Eq. 28 (E. & A. 1941); Coombs v. Witte, 104 N.J.L. 519 (E. & A. 1928).
The entire judgment, including the dismissal of the third-party complaint, is reversed and the cause is remanded to the Law Division for further proceedings consonant with this opinion.