In re FARMERS' CO-OP OF ARKAN-
SAS AND OKLAHOMA, INC.,
Debtor-in-Possession.

Bankruptcy No. FS 84-046M.

United States Bankruptcy Court,
W.D. Arkansas.
Fort Smith Division.

Oct. 23, 1984.

Diane S. Mackey, Little Rock, Ark., for
debtor-in-possession.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

Farmers' Co-Op of Arkansas and Okla-
homa, Inc. (co-op) filed a voluntary petition
for bankruptcy on the 23rd day of Febru-
ary, 1984 under the provisions of Chapter
11. On March 2, 1984 Citizens Bank and
Trust Company of Van Buren (bank) filed a
claim as a general unsecured creditor for
$369,980.03, principal, and $43,940.19, inter-
est as of February 29, 1983. On April 23,
1984 the debtor-in-possession filed an objec-
tion to this claim and on September 14,

1984 filed an amended objection to the claim.

The claim is based on a purported guaranty of the co-op executed in 1980 by Jack White, who was then general manager of the debtor-in-possession. Mr. White was also the chairman of the board of the bank. The guaranty purported to guarantee the repayment of all indebtedness owed to the bank by one Wayman Calavan, later a member of the board of directors of the co-op.

The objection and amended objection allege specific defenses of failure of consideration and ultra vires acts of Jack White, as well as general allegations that the guaranty is without legal validity, and, therefore, the claim should not be allowed. At the trial the debtor sought to introduce evidence to the effect that the guaranty had been revoked. The bank objected claiming that revocation was not pleaded. The Court received the evidence over the objection of the bank pending an opportunity for the parties to research the question and present authorities to the Court.

■ 11 U.S.C. § 502(a) provides as follows:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

Rule 3007 of the Bankruptcy Rules provides as follows:

An objection to the allowance of a claim shall be in writing and filed with the court. A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor-in-possession and the trustee at least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.

These two provisions construed together mean that a claim properly filed is presumptively allowed as filed unless objected to by a party in interest, who then has the burden of going forward with the evidence to rebut the presumption of validity. However, the burden of proving the validity of the claim ultimately rests with the creditor. 3 *Collier on Bankruptcy* § 502.01 [3 (15th Ed.)]; *In Re Trending Cycles for Commodities, Inc.*, 26 B.R. 350 (1982); *In Re Kontaratos*, 35 B.R. 135 (1983); *In Re Central Rubber Products, Inc.*, 31 B.R. 865 (Bky.1983).

■ An objection to a claim is a contested matter and the proceedings regarding contested matters are governed by Rule 9014 of the Bankruptcy Rules. Rule 9014 does not make applicable Rule 7007 or Rule 7008 to contested matters; hence, the rules of pleadings generally applicable to adversary proceedings are absent here. For instance, no response or answer to an objection is necessary under this rule. All that is required is that the creditor be afforded notice and an opportunity to proceed to prove its claim. The objections to the evidence regarding revocation are, therefore, overruled.

Furthermore, Citizens Bank's claim of surprise was not evident in the trial that proceeded. Counsel on both sides were well prepared for the trial and obviously knew through pre-trial discovery of the existence of all the evidence pertaining to the issue of revocation of the guaranty. Both sides presented documentary as well as oral testimony on this issue.

I.

The Farmers' Co-Op of Arkansas and Oklahoma, Inc. is a farm co-operative which was first organized in 1946. Its principal place of business is Van Buren, Arkansas, although it has facilities located elsewhere in Arkansas and Oklahoma. In August of 1980 Jack White was the general manager of the co-op and had general authority over the day-to-day operations, including the authority to draw checks, to borrow money, as well as authority to execute contracts of guaranty on behalf of the co-op. This authority was granted by the board of directors of the co-op and memori-

alized by formal resolutions which were furnished to the bank. Jack White was in August of 1980 also chairman of the board of Citizens Bank & Trust Company of Van Buren. During all relevant times connected with this controversy the business affairs of the co-op and the bank were close, interrelated, and interdependent. The bank, under Mr. White's leadership, and, thereafter, under the leadership of Mr. Bob Hammerschmidt, its present chief executive officer, wanted to establish itself as the leading agri-business oriented bank in the two state area. To accomplish this goal, the bank worked closely with the co-op whereby customers of the co-op would receive preferred treatment at the bank in regard to their financial needs whether related to customer accounts at the co-op or to the customers' general credit needs. Generally, these customers were farmers. There was even testimony that customers of the co-op could, and did, obtain loans from the bank which were prepared by co-op employees and executed at the co-op premises. During one period of time, the credit manager of the co-op would spend at least one day a week "working on loans" in bank facilities and was compensated sometimes directly by the bank and other times the bank would simply reimburse the co-op which would pay the employee. Under Mr. White's management the co-op engaged in the practice of executing contracts of guaranty for loans of co-op customers, especially board members.

In August 1980 Wayman Calavan, who lived in nearby Oklahoma, was neither a customer of the bank nor the co-op, but was known to Mr. White to be a prominent farmer who should be recruited by the bank, and presumably by the co-op, as a customer. Mr. White discussed this possibility with Mr. Hammerschmidt, and, in anticipation of landing Mr. Calavan as a customer of the bank, Mr. White, exercising his co-op authority, executed an unlimited contract of guaranty on behalf of the co-op in favor of the bank covering Mr. Calavan's debts to the bank. No one else witnessed the execution of this guaranty. This highly unusual arrangement was made without the slightest indication that Mr. Calavan's credit needs and credit worthiness warranted a guaranty and was done, according to Mr. Hammerschmidt, as a marketing technique, whereby Mr. Calavan might be made to feel more welcome at the bank, and his loan needs administered to more expeditiously. There was no evidence that Mr. Calavan requested a guaranty from the co-op or even knew of its execution. Mr. Calavan was successfully recruited as both a customer of the bank and the co-op, although his first loan from the bank did not occur until 1982, some eighteen months after the guaranty was executed by Mr. White on behalf of the co-op. By then, Mr. Calavan was on the board of the co-op and by March of 1983 indebted to the bank in excess of $300,000. His financial statement which was furnished to the bank showed a net worth as of February 1982 of $2.7 Million, and the bank's loan documents indicated cattle and the borrower's financial statement as security. Subsequently, in the latter part of 1983, Mr. Calavan filed a Chapter 7 bankruptcy petition in the Eastern District of Oklahoma, and testimony was that his case was generally regarded by the bank as a no asset case from which the bank could expect to recover nothing. The cattle, it turned out, were encumbered by several liens prior to the bank's, were infected with brucellosis, and were starving. They had to be sold by the trustee, and none of the proceeds were available to the bank. Needless to say, the financial statement turned out to be overstated.

Meanwhile, in the latter part of 1981, Jack White experienced difficulties with the authorities arising in some way, not explained to the Court, out of his relationship and employment with the co-op. Testimony was that he was indicted by the Federal Grand Jury and as a result resigned from the board of the bank as required by banking regulations. He was subsequently convicted of a felony, and in 1982 served a sentence in the penitentiary. He was terminated by the co-op as general manager, and in November of 1982 a new

resolution substituting Fred Howard as the only person authorized to execute contracts of guaranty was forwarded to the bank.

Furthermore, in February and March 1981 there had been a series of discussions between Mr. Hammerschmidt, Mr. White, and Mr. W.D. "Bo" Nigh regarding co-op related loans. Mr. Nigh was the co-op's credit manager, and he testified that as a result of that meeting he wrote a letter to the bank on February 25, 1981 outlining the understanding he had and that this included an understanding that the co-op would no longer guarantee loans to the bank and that there was to be no recourse on the co-op. This letter was introduced as an exhibit at the trial. Mr. Nigh testified that during this period he requested and received a list of co-op guaranteed loans; that he worked these loans in an effort to reduce the co-op's contingent liability, but that he was never aware of the co-op's guarantee of the Calavan loan and that the Calavan loan was not on the list furnished him by the bank. The bank asserts that list furnished Mr. Nigh was not just a list of co-op guaranteed loans, but a mixed bag of co-op related loans, some of which were guaranteed and some which were not.

Thereafter, on March 17, 1981, Mr. Hammerschmidt wrote Mr. White what he characterized as a response to Mr. Nigh's letter in which he outlined his understanding of the future relationship between the bank and the co-op. This letter was generally not responsive to Mr. Nigh's letter, but did mention the possibility of co-op guarantees on marginal loans in the future. Mr. Hammerschmidt expressed concern about possible bank liability because of loans being made in the bank's name by co-op personnel. He testified that he was concerned about the co-op's practice of issuing demand notes to the patrons of the co-op in order to raise capital. He acknowledged that his concern was that this practice could be construed to be the issuance of securities,[1] and said he tried to assist the co-op in finding more conventional financing.

Mr. Calavan's notes became again due in March of 1983 and the due dates were extended by an extension agreement executed by Mr. Calavan and the bank to October 1, 1983. These extension agreements were executed in March of 1983 and were done without the consent of the co-op. No reservation of rights against the co-op was preserved in any of the extension agreements. The Court is convinced that no one at the co-op had any idea that the guaranty even existed. The co-op by this time was in serious financial trouble, and it would have been a reckless act for it to guarantee anyone's debt.

For a contract of guaranty to be valid there must be consideration. *Pacific Industries, Inc. v. Mountain Inn, Inc.,* 232 F.Supp. 801 (1964). The principal contract [loan] is, however, sufficient consideration for the guaranty contract. *Pacific Industries, Inc. v. Mountain Inn, Inc., supra; John Mohr & Sons v. Apex Terminal Warehouses, Inc.,* 422 F.2d 638 (1970).

According to the undisputed testimony, the guaranty in question, being executed without consideration and being in the nature of a continuing guaranty by an uncompensated surety, is under the law but a continuing offer or promise to guarantee in the future. 10 *Williston on Contracts* ¶ 1253, pp. 807–808. A contract of guaranty is thereafter formed as each credit in the contemplated series is given until the guaranty is revoked. 10 *Williston on Contracts, supra; Fidelity National Bank of South Miami v. Melo,* 366 So.2d 1218 (1979). Stated another way, it is at its inception an offer from the guarantor and is accepted by the creditor each time the latter does a specific act, e.g., extend credit to the debtor. *Swift Company v. Smigel,* 115 N.J.Super. 391, 279 A.2d 895 (1971).

Typically, as here, the guaranty reserved unto the guarantor the power to revoke it unilaterally prior to action by way of acceptance by the creditor. *Swift & Company v. Smigel, supra;* 38 *Am.Jur.2d,* Guaranty § 63 at p. 1064; *Spears v. El Dorado*

---

1. *See, Monsen v. Consol. Dressed Beef Co., Inc.,* 579 F.2d 793 (1978).

*Foundry Machine & Supply Co.,* 242 Ark. 590, 414 S.W.2d 622 (1967); 10 *Williston on Contracts* ¶ 1252, pp. 807–808; *Sumitomo Bank of California v. Iwasaki,* 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968).

Courts tend to regard uncompensated sureties as favorites of the law and they are entitled to have their contract of guaranty strictly construed. *Spears v. El Dorado Foundry Machine & Supply Co.,* 242 Ark. 590, 414 S.W.2d 622; *Moore v. First National Bank of Hot Springs,* 3 Ark.App. 146, 623 S.W.2d 530 (1981); *Inter-Sport, Inc. v. Wilson,* 281 Ark. 56, 661 S.W.2d 367 (1983). Therefore, a creditor who by positive contract with a principal debtor without the consent of an uncompensated surety extends the time of payment without preserving its rights against the surety thereby discharges the surety. *Restatement of the Law of Surety* § 129(1); *J.R. Watkins Co. v. Bruno,* 160 Wash. 183, 294 P. 1024 (1931); *Securities and Exchange Comm. v. H.L. Rodgers & Bro.,* 444 F.2d 1077 (1971); *Bank of Nova Scotia v. St. Croix Drive-In Theatre,* 552 F.Supp. 1244 (1982); *Columbia Broadcasting Systems, Inc. v. Stokely-Van Camp, Inc.,* 522 F.2d 369 (1975); *Cole v. Exchange National Bank of Chicago,* 183 So.2d 195 (1966); *Gleason v. McDonald,* 103 F.2d 837 (1939); *Tomlin v. Ceres Corporation,* 507 F.2d 642 (1975); *Scott v. Citizens Bank of Batesville,* 245 Ark. 235, 431 S.W.2d 832 (1968); *Spears v. El Dorado Foundry Machine & Supply Co., supra.*

Here, in the Court's view, the continuing contract of guaranty was revoked by March 1983, and the execution of the extension agreements discharged the co-op from liability. The revocation was evidenced in writings consisting of Mr. Nigh's letter of February 25, 1981 and by delivery of the resolution of November 12, 1982 substituting Fred Howard for Jack White as the only party who was authorized to bind the co-op on a guaranty contract. The guaranty provides that it may be revoked in writing. The testimony is unequivocal that after Mr. White left no one in the co-op knew of the existence of the guaranty. There was no evidence that Mr. Calavan ever knew. This contingent liability was never on the books of the co-op, and, according to the evidence, the only people aware of the guaranty at the time of the March extensions were officials of the bank, in particular, Mr. Hammerschmidt, who was the only other witness to the guaranty's execution other than Mr. White. However, Mr. Nigh's letter of February 25, 1981 was specific when it stated "The Co-Op will not sign a guaranty." Under the peculiar facts of this case and given the extensive knowledge that Mr. Hammerschmidt had of the co-op's business affairs, it is unreasonable to suppose that the bank could not have concluded by March 1983 from the written notifications received that the co-op had effectively revoked its previous offer to guarantee indefinitely and in whatever amount the debts of Wayman Calavan.

The claim is, therefore, denied.