130 N.J. Super. 151 (1974)
325 A.2d 843
FIRST NEW JERSEY BANK, ETC., PLAINTIFF,
v.
F.L.M. BUSINESS MACHINES, INC., ETC., ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
August 23, 1974.
*152 Mr. Harold Wovsaniker for plaintiff First New Jersey Bank.
Mr. John Fiorello for defendant Horace Goodenough (Messrs. Hoffmann & Fiorello, attorneys).
*153 Mr. David J. Sheehan for defendant John MacMahon (Messrs. Crummy, Del Deo, Dolan & Purcell, attorneys).
DREIER, J.D.C., Temporarily Assigned.
Plaintiff has moved for summary judgment against two signers of unconditional and continuing guaranties of the obligations of F.L.M. Business Machines, Inc. (hereinafter referred to as F.L.M.). Although there were several parties who executed the guaranty form, the issues in this case involve only defendants John D. MacMahon and estate of Horace Goodenough (the late Mr. Goodenough having been one of the endorsers).
The parties have submitted this case on an agreed statement of facts, the pertinent portions of which are as follows: The $37,500 promissory note upon which the bank bases its claim was executed by F.L.M. and delivered to the bank on September 27, 1971. It was signed on behalf of the corporation by Robert G. Walker and Richard Froumi, who are also guarantors and against whom judgment has already been entered. The note was due on October 27, 1971.
The history of F.L.M.'s relationship with the bank as a borrowing customer extends back to February 1967. On July 31, 1970 defendant MacMahon, decedent Horace Goodenough and other officers and directors of F.L.M. executed and delivered to the bank an unconditional and continuing guaranty of the obligations of F.L.M. Four days later, on August 4, 1970, the bank advanced the sum of $45,000 to F.L.M., evidenced by the corporation's note. This transaction consisted of a renewal by the bank of $12,500 of prior F.L.M. obligations and a new loan of $32,500. The $45,000 would not have been advanced if the guaranty were not executed and delivered. (In addition, although it is deemed by this court not to be pertinent to the present inquiry, the note was personally endorsed by Horace Goodenough and one other defendant).
*154 The original note had a 90-day maturity to November 2, 1970. Ten days after the due date the note was replaced by a note dated November 12, 1970 in the same amount, and thereafter was successively renewed, although on February 18, 1971 F.L.M. made a principal payment of $7,000, thereby reducing the principal amount to $37,500. Renewals were made on February 18, 1971, March 19, 1971, and June 3, 1971. These notes are not available and the parties have no indication as to whether these notes had been marked "paid," "paid by renewal," or "renewed." Each time the note was renewed interest was discounted in advance.
Horace Goodenough died on June 11, 1971, and within one day plaintiff's branch manager was notified of his death. The bank's credit department received immediate notification by the branch manager.
On July 14, 1971 the bank accepted another new promissory note from F.L.M. and returned the note of June 3, 1971. There was no notification by the bank to the estate of this transaction. The procedure was repeated on August 13, 1971, again with no notice to the estate.
On September 8, 1971 defendant MacMahon (whose employment had been terminated May 19, 1971) resigned as an officer and director of F.L.M. and gave formal notice to the bank that he terminated and revoked his obligations under the guaranty. This notification was received by the bank on September 13, 1971.
On September 27, 1971 the bank again renewed the corporate obligation, and it is this note of September 27, 1971 that is the basis of plaintiff's suit. After the application of the value of corporate collateral, the balance due is $27,406.74 plus interest and costs.
The guaranty in question is the usual complicated, small-print type of banker's guaranty, in general use throughout the State, and is entitled "Guarantee [sic] of all Liability." The pertinent parts read as follows:
In order to induce the First State Bank of Union, Union, N.J., (hereinafter called the "Bank"), its successors, subsidiaries, endorsees *155 or assigns to make such advances, loans, discounts or extensions of credit as it may deem advisable directly or indirectly to or for the account of

F.L.M. BUSINESS MACHINES INC.
for any one or more of them jointly and/or severally (each, any and all of whom are hereinafter called "Borrowers") and/or to grant to or for the account of Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of legal rights as Bank may deem advisable, and in consideration of advances, loans, discounts or extensions of credit, due or to become due, heretofore made to Borrower and for other valuable consideration, receipt of which is hereby duly acknowledged, the undersigned (each, any and all of whom are hereinafter called "Guarantor", and who, if two or more in number, shall be jointly and severally bound hereunder) hereby guarantee to the Bank its successors, subsidiaries, endorsees, and assigns, the prompt and unconditional payment of each and every obligation of Borrower to Bank, its successors, subsidiaries, endorsees, or assigns whether or not represented by negotiable instruments or other writings, whether direct or indirect, absolute or contingent, due or not due, secured or unsecured, original, renewed or extended, now in existence or hereafter incurred, originally contracted with Bank or with another or others and assigned or transferred to or otherwise acquired by Bank, and whether contracted by Borrower alone or jointly and/or severally with another or others (all of the aforementioned being hereinafter referred to as "Obligations").
Guarantor consents that, without notice to or further assent by Guarantor, the liability of Borrower or of any co-guarantor or of any other party for or upon any of the aforesaid Obligations may from time to time, in whole or in part, be renewed, extended, modified, prematured, compromised or released by Bank, as it may deem advisable, that any collateral and/or lien or liens for any of the aforesaid Obligations, or for this guarantee, may from time to time, in whole or in part, be exchanged, sold, or surrendered by Bank, as it may deem advisable and that any deposit balance or balances to the credit of Borrower or any party liable for or upon any of the aforesaid Obligations may from time to time, in whole or in part, be surrendered or released by Bank, as it may deem advisable, all without impairing, affecting or releasing the liability of Guarantor hereunder.
Guarantor waives any and all notice of the acceptance of this guarantee or of the creation, renewal, extension or accruals of any of the aforesaid Obligations, present or future, or of the reliance of Bank upon this guarantee. Each of the aforesaid Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon this guarantee, and all dealings between Borrower and Bank shall likewise conclusively be presumed to have been had or consummated in reliance upon this guarantee. Guarantor waives protest, presentment, demand for payment, notice of default *156 or non-payment, and notice of dishonor to or upon Guarantor, Borrower, or any other party liable for any of the aforesaid Obligations.

* * * * * * * *
* * * This guarantee may be terminated only by written notice to that effect signed by Guarantor, delivered to and receipted for by Bank, which notice shall be effective solely with respect to new Obligations incurred subsequent to the receipt by Bank of the notice of revocation of this guarantee as hereinafter provided for; and in the event of such termination (whether by such notice, death or otherwise) Guarantor and his, its or their respective successor, executors, administrators and assigns shall nevertheless remain liable with respect to the aforesaid Obligations, created and arising theretofore, and with respect to such Obligations and any renewals, extensions, or other liabilities arising out of the same, this agreement shall continue in full force and effect, and Bank shall have the right herein provided for as if no such termination had occurred.
This agreement shall be binding upon the undersigned and the legal representatives, successors and assigns of the undersigned, and shall be governed by and construed in accordance with laws of the State of New Jersey.

I
There appears to be no decided case in New Jersey generally construing the effect of the common forms of continuing guaranties used by banks, and, in particular, setting the standards that should apply in the case of either (a) an attempted revocation of the guaranty or (b) the death of a guarantor who has signed such form. It is clear, however, that the language of such a guaranty must be interpreted most strongly against the bank which has prepared the form, and at whose instance the language was included therein. Josefowicz v. Porter, 32 N.J. Super. 585 (App. Div. 1954); St. Paul Fire and Marine Ins. Co. v. N.J. Bank and Trust Co., 104 N.J. Super. 367 (Law Div. 1969), certif. den. 59 N.J. 265 (1971).
The only New Jersey cases discovered by the court that bear upon the effect of the death of a guarantor upon his obligations under a continuing guaranty are Swift and Co. v. Smigel, 115 N.J. Super. 391 (App. Div. 1971); Adelman v. Franklin Washington Trust Co., 137 N.J. Eq. 257 (Ch. *157 1945), and L. Teplitz Thrown Silk Co. v. Rich, 13 N.J. Misc. 494 (Circ. Ct. 1935). None of these cases, however, involved a form of continuing bank guaranty. In the Swift and Co. case, which involved the incompetency of the guarantor, Judge Conford also discussed the rules relating to the death of the guarantor, and specifically whether a revocation of the guaranty by death is effective prior to notice of the death by the obligee. In our case this issue is not important, since it is acknowledged that the bank had such notice before the note was renewed. In Swift and Co., goods were sold and delivered, thus creating new obligations, after the incompetency of the guarantor. The court there held that the decisive consideration should be the actual or reasonably imputed knowledge by plaintiff of the guarantor's incompetency at the time of each advance of credit. In our case, however, the credit was advanced prior to Mr. Goodenough's death, and the only actions thereafter were renewals of the note. The significance of this difference will be discussed later.
In the Adelman case our former Court of Chancery held that a valid agreement between a principal debtor and creditor extending for a definite time the payment of the debt releases a guarantor if made without his consent. The court further found that the taking of renewal notes was such an extension of the time of payment as would effect a release of the guarantors. But case also is distinguishable in that the guaranty form in our case expressly authorizes such renewals. The Teplitz case may also be distinguished on the same basis.
Judge Conford in Swift and Co. noted that, without binding precedents, the standard formulations of rules concerning commercial transactions need not be routinely followed if they do not comport with commercial reality. In first-instance litigation:
* * * The search should be for the rule which will accord with the reasonable expectations of persons in the business community involved in transactions of this kind. * * * [115 N.J. Super. at 398] *158 This court will endeavor to follow the same principle.
The commercial world to a large extent operates on credit supplied by commercial banks. Often corporations are organized and operated with meager capital, and corporate borrowing is supported to a large extent on the basis of individual or corporate guaranties of loan transactions (leaving to one side the whole subject of collateralized loans).
Although the parties have agreed in this case that the loan would not have been granted but for the execution of the continuing guaranty, the bank in preparing the guaranty form foresaw the possible issue of reliance being raised in some case, and included express language that the "aforesaid Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon this guarantee." The "aforesaid Obligations" included not only the original loans, but any renewals thereof. Although the testimony of Mr. Kest, the bank officer in charge of the loan, was ambiguous on the question of reliance, this court finds that there was actual reliance, based upon the statement that he would not have approved the renewal if he knew that a guarantor had revoked. His misinformation, however, does not destroy the legal effect of the contract documentation.
When long-term credit is granted, the renewal problem is not severe. But where short-term credit, renewable on a 30 or 90-day basis, is in issue, it would be unduly burdensome to require a bank to seek out each guarantor, endorser or surety, and obtain express approval of each renewal. In the event an endorser or a guarantor were on vacation, sick or otherwise unavailable, a bank would be forced to call the corporate loan or carry the same on a past-due basis, thus adversely affecting the credit standing of the corporation. To obviate the necessity of such action, guaranty forms have been drawn expressly to cover many situations in which under common law rules a guarantor would be released from renewal obligations. This court finds no legal or practical reason to withhold enforcement of the terms of such agreements.
*159 This analysis accords with the majority view in the country. See, e.g., Bennett v. Checotah State Bank of Checotah, 176 Okl. 518, 56 P.2d 848 (Sup. Ct. 1936), where the court stated:
In that class of cases, then, where the consideration has wholly passed and the guarantor has agreed in advance to extensions, he cannot prevent the creditor from extending or renewing the note or contract, and if extensions or renewals are granted the guarantor is still bound and the power of revocation is beyond him.

* * *
The rule that where the consideration is entire and has been executed the guaranty is not revocable by the guarantor, and that if he could not revoke the guaranty by notice in his lifetime his death does not revoke it, is thoroughly ingrained in the law.

* * *
The guaranty included the right in the creditor to give extensions. The grant of that right was an act which took place in the guarantor's lifetime. It therefore is inappropriate to argue that "dead guarantors can make no new promises," for the right of renewal and extension did not here depend on any implied new promise, but was derived from the old promise, made by the guarantor at the inception of the contract. That promise related to the fulfillment of the contract entered into at that time, for which the entire consideration passed at that time, and is as binding upon the estate of the promisor as any other right of property he may have vested in other parties during his lifetime. There was no necessity for the implication of new promises of guaranty coincident with the creditor's parting with new or additional consideration (as in the second class of guaranties mentioned above, in which death would have revoked the guaranty), for neither did the creditor furnish any new or additional consideration nor would such have been authorized by the terms of the guaranty. In extending the original debt the creditor merely exercised a right which was vested in it by and during the lifetime of the guarantor at the inception of the contract of guaranty, and no implication of a new or fresh consent was necessary. It follows that the extensions did not operate to relieve the guarantor's estate from liability. [56 P.2d at 850]
In Exchange National Bank v. Hunt, 75 Wash. 513, 135 P. 224 (Sup. Ct. 1913), on facts practically identical to the case at bar, the court held:
The contract of guaranty upon which the action is based did not guarantee the payment of a negotiable instrument, but did in terms guarantee any and all existing loans and any renewals thereof, not to exceed the sum of $10,000. * * *

* * *
*160 From the facts already stated, it appears that the debt existing at the time of the death of C.W. Hunt, had in no particular been paid, except the interest thereon. The renewal demand note of September 17th did not extinguish the obligation. The language of the guaranty expressly covers the obligation and not the evidence thereof. The Hunt estate was not discharged by the giving of the demand note. [135 P. at 225-226]
See also, First National Bank of Boston v. McGowan, 296 Mass. 101, 5 N.E.2d 5 (Sup. Jud. Ct. 1936); Corn Exchange Bank and Trust Co. v. Gifford, 268 N.Y. 153, 197 N.E. 178 (Ct. App. 1935); In re Johnson's Estate, 167 Misc. 318, 5 N.Y.S.2d 24 (Surr. Ct. 1938); Tyler Bank & Trust Co. v. Shaw, 293 S.W. 2d 797 (Tex. Ct. Civ. App. 1956); 38 C.J.S. Guaranty § 76 at 1244-1245; 38 Am. Jur.2d, Guaranty, §§ 63, 64 and 69 at 1064-1066, 1069-1070. The analysis in the Am. Jur. section last cited comports with Judge Conford's analysis of the guaranty in the Swift and Co. case, supra., where he stated:
Neither of the parties to this appeal disputes that the agreement upon which this action was brought was a continuing guaranty of the kind "which is not limited to a particular transaction * * * but which is intended to cover future transactions." See Fidelity Union Trust Co. v. Galm, 109 N.J.L. 111, 116 (E. & A. 1932). A continuing guaranty is at its inception an offer from the guarantor and is accepted by the creditor each time the latter does a specified act (e.g., extending credit to the debtor). * * * [115 N.J. Super. at 394]
As the editors of Am. Jur. noted, one must distinguish between a contract of guaranty and an offer to guarantee. The offer is revoked by the death of the guarantor, but once sums have been advanced based upon the strength of the offer to guarantee, and a contract is in effect, the contract may not be so revoked. Where, as in this case, the contract includes the term providing for renewals, such renewals also may be made without terminating the guarantor's liability.
The estate has cited several out-of-state cases to support its position. The first case, Bedford v. Kelley, 173 Mich. 492, 139 N.W. 250 (Sup. Ct. 1913), is distinguishable in *161 that the guaranty there did not provide for renewals or extensions, and thus the same rules as were cited above generated the opposite result. Other cases cited by defendants support their position, but the same were cases decided before 1900, and were products of a different era. See National Eagle Bank v. Hunt, 16 R.I. 148, 13 A. 115 (Sup. Ct. 1888); Gay v. Ward, 67 Conn. 147, 34 A. 1025 (Sup. Ct. Err. 1895), and Home National Bank v. Waterman, 30 Ill. App. 535, aff'd 134 Ill. 461, 29 N.E. 503 (Sup. Ct. 1890), this latter case also having been followed in Commonwealth Trust and Savings Bank v. Hart, 268 Ill. App. 322 (App. Ct. 1932).

II
A slightly different situation is presented in the case of defendant MacMahon in that it was not his death but an express notice to the bank that is claimed to have terminated his liability. Again, however, we must look at the difference between an offer to guarantee and a contract of guaranty. Once the advance had been made by the bank, defendants were bound by the terms of their agreement. Under this agreement a notice of termination was effective only as to any future advances which might have been made by the bank, and guarantors remained liable with respect to the original obligations "and any renewals, extensions or other liabilities arising out of the same." As to such renewals the bank retained all of its rights "as if no such termination had occurred." The case of Adelman v. Franklin Washington Trust Co., supra, cited by defendant MacMahon, is inapposite since there was no provision in the mortgage bond for a renewal or extension. Also, the case of Merchants' National Bank v. Cressey, 164 Iowa 721, 146 N.W. 761 (Sup. Ct. 1914), is distinguishable. There the guaranty provided that the guarantor would pay the bank "all the money advanced and loaned the said Cedar Rapids Cereal Company on or after this date, including any renewals thereof, without notice to us, * * * This guaranty to be effective until thirty (30) days written notice to *162 the contrary is given the [bank] by the undersigned." Defendant was held to be relieved of his obligation to pay a loan renewed more then 30 days after the revocation of the guaranty. Nowhere in that guaranty was there an express promise to be responsible for renewals made subsequent to the revocation. In the case at bar there was such an undertaking, and defendant MacMahon also will be held to his contract.

III
Lastly, defendants assert that they should be given the benefit of equitable considerations in construing and applying the guaranty agreement. They note, as the court has noted in the opening of this opinion, that their guaranty did not result from arms-length bargaining between the bank and guarantors with respect to the terms of the contract. They state that the guaranty is finely printed on a standard form prepared by the bank and must be executed by any guarantor if he hopes to obtain the financing sought from the bank. They ask to be relieved from its provisions, citing Unico v. Owen, 50 N.J. 101, 111-115 (1967), in which purchasers of consumer paper were held not to enjoy the status of holders in due course, by virtue of their connection with the payees. A similar principle was enunciated in Henningsen v. Bloomfield Motors Inc., 32 N.J. 358 (1960) and its progeny, where an inequitable provision in a contract of adhesion was held to be unenforceable with respect to a consumer. And cf. N.J.S.A. 12A:2-302 permitting a court to refuse to enforce an unconscionable provision of a sales contract.
While it is true that the courts of this State have long possessed the power, both in law and in equity, to relieve a party from the burden of the agreement (see the New Jersey Study Comments to N.J.S.A. 12A:2-302), this is not a case for the application of such power. The parties freely entered into the guaranty agreement knowing full well the import of the same. This was a business transaction, *163 and there were other sources of financing which could have been explored, (such as other banks, private lenders, commercial factors, etc.), if defendants did not wish to sign such an all-inclusive guaranty agreement. Although, in the appropriate case, the mere existence of the commercial setting need not preclude the court's exercise of its equitable jurisdiction, the facts here do not entitle defendants to such relief. Cf. Moreira Construction Co., Inc. v. Moretrench Corp., 97 N.J. Super. 391, 395 (App. Div. 1967), aff'd o.b. 51 N.J. 405 (1968), where the court held that the commercial setting and the existence of viable alternatives to the disputed contract fortified the enforcement of a contractual allocation of risks provision; Mayfair Fabrics v. Henley, 48 N.J. 483, 488 (1967), involving a similar provision in a lease; and Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117, 125-127 (App. Div. 1960), involving indemnification by a contractor. Even the Study Comments to § 2-302 of the Uniform Commercial Code show that it is not superior bargaining power but oppression or unfair surprise that will justify a finding of unconscionability in a sales contract. Such factors are not present in this case.
Defendants were not powerless to protect themselves against F.L.M.'s deteriorating financial position. If at any time they (or either of them) determined that their best interests were served by paying the balance to the bank, and becoming subrogated to the bank's rights, they could have cut their losses. They chose not to do so. In addition, the renewals caused defendants to suffer no additional losses. The bank could have carried the item as past due for the same period of time, and then brought this suit. The time period was not so long as to entitle defendants to claim laches or any prejudice from the delay.
For the foregoing reasons, and based upon the agreed statement of facts, judgment will be entered in favor of plaintiff and against defendants John MacMahon and the estate of Horace Goodenough in the amount of *164 $27,406.74. Prejudgment interest is discretionary with the court. Rova Farms, Inc. v. Investors Ins. Co. of America, 65 N.J. 474 (1974). At least to some extent, the renewal practices of the bank have given rise to this litigation and the concomitant costs to defendants. This court therefore has chosen not to award such prejudgment interest.