CHEMICAL BANK, Plaintiff-Appellant, v. DAVID PAUL, Defendant-Appellee.

First District (3rd Division)    No. 1—90—0362

Opinion filed April 14, 1993.

Hopkins & Sutter, of Chicago (Glen H. Kanwit, William J. McKenna, Jr., and Mary Kay McCalla, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Thomas D. Allen, Thomas E. Patterson, Richard D. Murphy, and Vincent J. Hart, of counsel), for appellee.

PRESIDING JUSTICE TULLY delivered the opinion of the court:

Defendant David Paul signed a personal guaranty of $5 million in connection with $90 million in loans received from Chemical Bank. After declaring the loans in default, Chemical foreclosed on the underlying property, which resulted in a deficiency of $40 million. Chemical then brought suit on the guaranty, wherein Paul alleged, as an affirmative defense, Chemical's breach of the implied covenant of good faith and fair dealing. Chemical appeals from the jury's finding in favor of Paul.

The undisputed facts are as follows. In November 1980, Paul borrowed $70 million from Chemical Bank for the renovation of the building at 666 North Lake Shore Drive, formerly known as "The Furniture Mart" of Chicago. The parties signed a four-year mortgage note, requiring interest to be due and payable on the first of each month, beginning January 1, 1981, with the principal payable in full at maturity, December 31, 1984. The note contained an acceleration clause whereupon all amounts owing under the note would become immediately due and payable at the option of the lender, without notice, "upon the happening of any default." The building loan agreement enumerated events of default. Furthermore, Chemical was under no obligation to make any further advances under the agreements. In addition to acceleration, the agreement listed "Other Remedies of the Lender," which stated "the Lender may *** in the Lender's sole and absolute discretion *** (b) at any time discontinue any work commenced in respect of the Improvements or change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise."

In connection with the note, and as an express condition of the loan, Paul was required to sign a partial guaranty of payment (the guaranty) for $5 million, which read in part:

"[I]n order to induce the Lender to make the Loan to the Borrower, the undersigned hereby guarantees, absolutely and unconditionally, to the Lender, the payment of the Guaranteed Portion of the Debt and covenants and agrees with the Lender as follows:

* * *

*The undersigned hereby waives* (a) notice of acceptance of this guaranty and of the making of the Loan by the Lender to the Borrower; (b) presentment and demand for payment of the Debt or any portion thereof; (c) protest and notice of dis-

honor or default to the undersigned or to any other person or party with respect to the Debt or any portion thereof; (d) all other notices to which the undersigned might otherwise be entitled; (e) any demand for payment under this guaranty; and (f) *all present and future defenses to the payment of the debt.*" (Emphasis added.)

Sales of condominium units at lower than expected rates necessitated an additional loan of $20 million in May 1982. In support of this loan, defendant signed a "Restatement of Guaranty" which acknowledged the original debt of $70 million and the existence of the guaranty. Paragraph E of this restatement reads:

"Lender is unwilling to make the Additional Loan to Borrower unless the undersigned (i) consents to the making of the Additional Loan to Borrower, (ii) consents to the execution of the New Note, the New Mortgage and the Amendment, and (iii) amends and confirms the terms and provisions of the Guaranty as hereinafter provided ***."

In a letter dated April 15, 1983, Chemical formally notified Paul that its loan to 666 Associates was "out of balance." Although Chemical described the project as "a product of the highest quality," it simultaneously demanded an immediate infusion of equity:

"The additional equity required must be deposited in Chemical Bank to cover all additional expenditures for the remaining life of the project, including interest, or it will trigger an Event of Default, which will require further action on our part."

Paul responded to the letter by arranging an additional subordinated loan of $6.5 million from the Westport Company, which held a limited partnership interest in 666 Associates. In consideration of this additional financing, Chemical signed the agreement to reduce partial guaranty of payment, whereby the guaranty would be reduced by 50 cents for each dollar of the first $6 million advanced by the Westport loan. However, this reduction would occur only "if the aggregate payments of principal and interest made on the Chemical notes and the Chemical Mortgages by January 30, 1984, are $35 million or more." In any event, the guaranty would not be reduced to an amount less than $2 million. Although Paul contends that the target amount was met, the guaranty was never reduced from the original amount of $5 million.

On August 29, 1984, due to the failure of defendant to pay the note of $20 million in full on May 1, 1984, and the interest installment on the note of $70 million also due, Chemical declared both

loans in default and demanded full and immediate payment on both loans. Thereafter, Chemical proceeded to foreclose on the underlying mortgaged property. In response, 666 Associates filed for reorganization pursuant to chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101 *et seq.* (1988)). Although the automatic stay provisions of the Bankruptcy Code temporarily forestalled the litigation, following a trial, the bankruptcy court allowed plaintiff to proceed with its foreclosure proceeding. This ruling was affirmed by *In re 666 Associates/Streeterville Utility Co.* (N.D. Ill. 1986), 65 Bankr. 819.

Following a four-day foreclosure trial, the Honorable Judge Scotillo ruled that Chemical was entitled to a foreclosure decree, which took priority over the mortgage held by Centrust Trust (formerly known as the Westport Loan Company). A judicial sale resulted in a deficiency of approximately $40 million. This ruling was affirmed in *Chemical Bank v. American National Bank & Trust Co.* (1989), 180 Ill. App. 3d 219, 535 N.E.2d 940. Judge Scotillo ordered the guaranty counts of the complaint to be severed for a separate jury trial and indicated that the ruling would not bar later motions to limit the introduction of defenses against the guaranty, which would be construed according to the written agreements between the parties.

Prior to trial, Chemical moved for summary judgment based upon the express waiver of defenses in the guaranty documents. Chemical argued that Paul could only present evidence of bad faith relating to the guaranty but not the debt, since the loans were expressly conditioned upon a guaranty of payment, waiving all defenses to the debt. Judge Edwin M. Berman denied summary judgment, ruling that there existed a genuine issue of material fact as to Chemical's good faith performance and that the defense of good faith could not be waived.

Prior to trial, Chemical filed a motion *in limine* to preclude the introduction of evidence as to the fair market value of the collateral; to preclude evidence of oral agreements which would contradict the express terms of the guaranty documents; and to rule that Chemical need not reprove the amount of the deficiency, which was conclusively determined in the foreclosure trial. This motion was denied.

On the first day of trial before Judge Allen A. Freeman, Paul motioned to amend his answer to the complaint, raising five additional affirmative defenses: (1) failure to state a claim due to Chemical's failure to allege its own good-faith performance; (2) modifica-

tion of the loan agreements; (3) hindrance of Paul's ability to perform under the loan agreements; (4) Chemical's waiver of its right to enforce the guaranty; and (5) Chemical's failure to mitigate damages. Chemical objected to the amendment, arguing that additional defenses were barred by the waiver clause in the guaranty agreements. After the close of Chemical's case in chief, Judge Freeman allowed the amended answer over Chemical's objection.

At trial, both sides presented differing versions as to the progress of the project. Timothy Callahan, a former vice-president at Chemical, testified as to the loan negotiations. After the initial loan of $70 million, it became apparent in 1982 that additional capital would be needed due to rising interest rates and a slump in the sale of condominiums. Chemical authorized an additional loan of $20 million and requested that Paul submit a plan to meet the increasing costs of the project. In early 1983, Callahan wrote a letter to Paul notifying him that the loan was "out of balance" and in need of an immediate infusion of capital. In the spring of 1983, to remedy the situation, Paul negotiated a subordinated loan of $6.5 million from the Westport Company in exchange for Chemical's agreement to reduce the partial guaranty, provided certain pay-back thresholds were met. Callahan described his relations with Paul to be cooperative and cordial at this time.

Callahan further testified that the continued slow sales of condominiums in the summer of 1983 necessitated further discussions in September 1983, wherein Paul was asked to produce projections which would reflect future sales and expenses as well as payback flows on the loans. Six months later, in March 1984, Paul sent the requested projections to Callahan, who notified Paul of his dissatisfaction with the figures. He considered the sales figures to be unrealistic and continued to be dissatisfied, even after a revision of the figures by Paul. Paul notified Callahan that he was being unreasonable and arranged a meeting with Al Lawrence, head of the real estate division at Chemical. The three met on several occasions to discuss the status of the loans. Callahan stressed the unreasonableness of Paul's sales projections. At the second meeting in April 1984, Paul indicated he would need funding of $2 million for tenant improvements, which would facilitate additional commercial leases. At this time, the original $90 million had already been depleted and no additional funds were available for tenant improvements. Lawrence told Paul he would need time to analyze his projections before making a decision and that the past-due interest amounts would have to be cleared up immediately.

The three met again in May 1984 with John Motley, a member of Chemical's asset management group, which deals with problem real estate loans. Paul proposed raising additional capital through syndicated sales and commercial leases and again requested tenant improvements. Lawrence said he did not want to make a decision on funding these improvements until he had a better understanding of the future capital flows on the project.

Paul testified that rental rates in 1981 and 1982 were higher than projected, providing excess revenues which were then used to fund tenant improvements, in order to make further leases possible. Chemical had full discretion in approving payments for tenant improvements. As part of a marketing plan in 1983 to increase revenues, Chemical approved the sale of the West Tower of the Furniture Mart to a syndicator, which netted $23.5 million. The proceeds consisted of $10 million in cash and a promissory note for $13.5 million. With Paul's consent, the $10 million was used to bring interest payments current and to reduce principal thereafter. In September 1983, $4.8 million was applied to past-due interest and $5.1 million was applied to the principal balance. According to Paul, this sale should have triggered the reduction of the guaranty under the agreement to reduce the partial guaranty. Paul said that Callahan would not consider past-due interest to be an event of default "so long as the loan-to-value ratio of the project stayed in line."[1] In fact, Callahan sent a letter to the Federal Home Loan Bank Board in July 1983 stating that the loan was not in default, in order to facilitate the loan of $6.5 million from the Westport Company. At the time, interest payments of $4.5 million were in arrears. Callahan testified that Chemical could have declared the loan in default, due to the past-due interest.

Paul further claimed that by January 1984, he had paid Chemical at least $35 million, sufficient to reduce the partial guaranty to $2.5 million from $5 million.[2] The Chemical internal memo of Jan-

---

[1]The loan-to-value ratio refers to the total amount of the loan divided by the total market value of the collateral property. Callahan testified that this ratio was 66% in 1983 ($90 million/$136 million) and that the customary rate was 75%. In a January 1984 internal memo, Chemical revised the loan-to-value ratio to 86%.

[2]Paul testified that the sale of the West Tower at $23.5 million plus the Homestead loan of $11 million plus condominium sales totalled together to meet the threshold of $35 million necessary to reduce the guaranty.

uary 1984 stated that only $18.4 million of the outstanding principal had been paid, from a total proceeds received of $27.5 million.[3]

In the spring of 1984, Paul continued to deal with Callahan and was notified in July that the loans had been transferred to John Motley in the asset management group, which deals with troubled loans. According to Paul, Motley took a markedly different view of the project than Callahan. Motley refused to allow any future sales to syndicators, citing an "internal policy" at Chemical. Although the previous sale of the West Tower for $23.5 million to a syndicator had been approved, Motley would not approve the proposed sale of the South Tower for $18 million and a sale of the commercial space for $45 million. Motley also refused to approve the plans and specifications on a commercial restaurant lease, which Callahan had approved prior to Motley's takeover. Paul described a total breakdown in communications with Motley's asset management group, and beginning in June 1984, no further leases were approved. Bernie Levin also informed Paul of Chemical's discontinuation of the policy of funding tenant improvements from condominium sales.

Motley testified that the proposal to purchase commercial space for $45 million required Chemical to finance 99% of the purchase and it was a "cash flow mortgage."[4] This proposal was unacceptable to Motley, who indicated that it was not even comparable to the previous sale of the West Tower, which provided Chemical with a down payment of $10 million.[5] Motley told Paul the loan was "out of balance" and in need of more capital. Motley stated that he met with Paul continually, sometimes biweekly, over a five-month period. Tenant improvements on proposed leases were not funded because those leases "fell through." Motley stated that the loans became out of balance in April 1984 and that the past-due interest as well as the loan-to-value ratio were major factors in deciding to declare

---

[3]The $27.5 million of proceeds consisted of the $11 million from Homestead, $6.5 million in condo sales and $10 million from the West Tower sale. Chemical did not include the promissory note of $13.5 million. Paul claims that this should have counted toward reducing the guaranty, since Chemical could have taken cash instead of a mortgage. Paul testified he received a "general acknowledgment" from Chemical that he had met the threshold to reduce the guaranty.

[4]Under a cash flow mortgage Chemical would only collect interest from cash generated by the property, *i.e.*, there would be no set monthly interest payment. According to Motley, the proposal would only have yielded 2% or 3% in annual interest.

[5]The cash portion of the West Tower sale was significantly higher than the proposed 1% down payment on the commercial space sale.

the loans in default in August 1984. Motley also testified that prior to 1984, tenant improvements were funded by cash flows from the project, even while the interest payments were past due. Motley claimed Chemical permitted interest to build up, since it anticipated a large cash inflow from the syndication of the West Tower.

In 1984, Chemical's policy changed since large interest payments became past due and there was no foreseeable inflow of capital. Paul said he could not raise any more capital from his partners in the project and the proposals to sell portions of the project, structured on a 1% down payment, were unacceptable to Chemical. In the summer of 1984, prior to declaring default, Chemical also changed its prior policy of applying project cash inflows to interest first and began paying down the principal. Motley testified that condominium sales in 1984 were insufficient to fund tenant improvements. He also stated that the loan-to-value ratio of 86% was unacceptable to Chemical. Motley cited lagging condominium sales, accumulated interest, mechanics lien claims and accrued real estate taxes as reasons for declaring the loan in default.

On August 28, 1984, Chemical presented Paul with an agreement outlining its conditions for any future funding of tenant improvements. After Paul refused to sign the document, on August 29, Chemical declared both the note of $70 million and the note of $20 million in default, due to 666 Associates' failure to pay the interest installment of May 1, 1984, and to pay the principal in full on the note of $20 million which matured May 1, 1984.

On appeal, Chemical presents five issues: (1) whether Chemical was entitled to a directed verdict, based upon the waiver clause in the guaranty, waiving all defenses to the debt; (2) whether Chemical was entitled to judgment notwithstanding the verdict; (3) whether the trial court improperly restricted the scope of Chemical's rebuttal testimony; (4) whether the trial court erred in allowing Paul to amend his answer, raising five new affirmative defenses after the close of Chemical's case in chief; and (5) whether the trial court erred in denying Chemical's motion *in limine*.

We initially consider whether Chemical was entitled to a directed verdict in its favor based upon the express waiver clause in the guaranty documents. If, in fact, Paul waived his right to present affirmative defenses at trial, then the verdict must be vacated, and the other issues need not be examined.

As set forth above, Paul signed a partial guaranty of payment of $5 million, wherein he waived "all present and future defenses to

payment of the debt." He subsequently signed a restatement of the partial guaranty of payment, which read:

"The undersigned hereby warrants and represents that *the undersigned has no defense, offset or counterclaim with respect to the Guaranty* or the obligations of the undersigned thereunder, and that the Guaranty continues to be the legal, valid and binding obligation of the undersigned." (Emphasis added.)

Although there has been much discussion in the briefs and during oral argument as to whether Paul waived defenses to just the debt and not the guaranty, the explicit language of the waivers, taken together, indicates that the waivers encompass defenses to the debt as well as defenses to the guaranty itself. We, therefore, need not attempt to decipher whether the defenses presented at trial concerned just the debt or just the guaranty or both.

■ Where a contract of guaranty is unequivocal in its language, courts will construe it in accordance with the language and intentions of the drafting parties. (*Bank of Naperville v. Holz* (1980), 86 Ill. App. 3d 533, 407 N.E.2d 1102.) This is true even where the guaranty contains broad statements of guarantor liability. (*Jacobson v. Devon Bank* (1976), 39 Ill. App. 3d 1053, 351 N.E.2d 254.) Guaranty agreements containing waivers of all defenses, including the duty to act in a commercially reasonable manner, have been upheld as validly binding. (*Lincoln Park Federal Savings & Loan Association v. Carrane* (1989), 192 Ill. App. 3d 188, 548 N.E.2d 636.) However, a covenant of good faith and fair dealing is implied into every contract, absent express disavowal. *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 421 N.E.2d 1375.

Plaintiffs rely upon *Lincoln Park Federal* as well as two Federal cases for the proposition that Paul waived all defenses to payment of the guaranty including the defense of good faith. (See *FIMSA, Inc. v. UNICORP Financial Corp.* (N.D. Ill. 1991), 759 F. Supp. 1297; *Home Federal Bank For Savings v. Daly* (N.D. Ill. 1990), No. 90—C—1670.) In *FIMSA*, the guaranty contained an unconditional guaranty of payment, wherein the guarantors waived "every defense, counterclaim or set-off." Although *FIMSA* does not specifically address waiver of good faith, the court cites to *Lincoln Park Federal* for the proposition that commercial reasonableness may be waived by the express language of the guaranty. In *Lincoln Park Federal*, the waiver provided: "the undersigned hereby waives demand, protest, notice of protest or notice of default, presentment

of payment and diligence in the collection of said note." (*Lincoln Park Federal*, 192 Ill. App. 3d at 192.) Although the words "commercial reasonableness" were not used, the court interpreted this language as a waiver of any obligation to act in a commercially reasonable manner. Similarly, in *Home Federal*, the guaranty contained an unconditional promise to pay "regardless of any defense, right of set-offs or claims." (*Home Federal*, slip op. at _____.) The guarantor presented an affirmative defense that the bank had acted in a commercially unreasonable manner by canceling a proposed sale of the loan collateral. Given the waiver language of the guaranty, the court found this defense to fail as a matter of law. The court ruled that summary judgment should have been granted to the creditor bank since the guaranty was unconditional and there were no meritorious nonwaived affirmative defenses to payment.

On the other hand, Paul argues that because he did not explicitly waive the defense of good faith, the bank was obligated to act in good faith under the loan agreements. In support thereof, Paul cites *B A Mortgage & International Realty Corp. v. American National Bank & Trust Co.* (N.D. Ill. 1989), 706 F. Supp. 1364, 1376-77, wherein the court held that the waiver of a creditor's bad faith violates public policy:

> "It must be recognized that the implied covenant of good faith reflects a strong public policy judgment: Parties with unfettered contractual discretion cannot be allowed to exercise that discretion in bad faith. And the essence of a sufficiently strong public policy is that it overrides contractual provisions—or more accurately, that the public policy will cause courts to deny enforcement of contractual terms to the opposite effect."

■ Under Illinois law, a waiver of defense clause does not "expressly disavow" the covenant of good faith implied into all contracts. (*Vincent v. Doebert* (1989), 183 Ill. App. 3d 1081, 539 N.E.2d 856; *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 421 N.E.2d 1375.) Moreover, plaintiff has failed to cite a single case which holds that the implied covenant of good faith has been waived. Plaintiff then cites cases from other jurisdictions which do not recognize a similar covenant of good faith and fair dealing. See, *e.g., Creeger Brick & Building Supply, Inc. v. Mid-State Bank & Trust Co.* (1989), 385 Pa. Super. 30, 560 A.2d 151; *Federal Deposit Insurance Corp. v. Nobles* (5th Cir. 1990), 901 F.2d 477.

We find as a matter of law that defendant, David Paul, did not expressly waive the defense of bad faith under the waiver of defenses clause in the loan agreement and personal guaranty. In accordance with the law and the public policy of this State, Chemical Bank was required to act in good faith in enforcing the loan agreements at issue. The exercise of good faith and fair dealing is particularly critical where, as here, the bank was granted considerable discretion in the use and application of the funds disbursed. Therefore, the trial court did not err in allowing the introduction of evidence relating to Chemical's bad faith. Likewise, the trial court did not abuse its discretion in denying plaintiff's motion for a directed verdict based upon the waiver clause in the guaranty.

In addition, although the evidence in this case is vast and highly disputed, the jury had the opportunity to weigh and consider all of the testimony and concluded that the bank did not act in good faith in its course of conduct *vis-a-vis* Paul. A jury's verdict will only be set aside where all the evidence, when viewed in a light most favorable to the defendant, so overwhelmingly favors the plaintiff that no contrary verdict based upon the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Based upon the evidence presented at trial and a thorough review of the record on appeal, we cannot conclude that the trial court erred in denying plaintiff's motion for judgment notwithstanding the verdict.

■ We next consider whether the trial court improperly restricted the rebuttal testimony of certain witnesses for plaintiff, namely Motley and Lawrence. Allegedly, they would have testified as to the economic deterioration of the project as the basis for declaring the loan in default. According to defendant, this was an improper attempt by plaintiff to change its basis for declaring default. During presentation of its case in chief, plaintiff only presented evidence of nonpayment of interest as the reason for declaring default.

The exclusion of specific testimony is harmless where the same evidence is presented by other testifying witnesses or where the excluded evidence would be merely cumulative. (*Chuhak v. Chicago Transit Authority* (1987), 152 Ill. App. 3d 480, 504 N.E.2d 875.) In this case, both Callahan and Motley testified as to the past-due interest on the loan as well as lagging sales of condominium units. Motley further testified as to his continual meetings with Paul concerning the lack of cash inflows from the project. According to Mot-

ley, tenant improvements could not be funded due to the lack of funds.

Motley and Callahan were both allowed to testify as to the economic deterioration of the project and their efforts to work with Paul in resolving the spiraling debt. Based upon our review of the record, we find that any limitation on plaintiff's rebuttal testimony was harmless error.

■ Lastly, we consider whether plaintiff was unfairly prejudiced by defendant's assertion of additional affirmative defenses after plaintiff had presented its case in chief. The decision to allow the amendment of pleadings is within the sound discretion of the trial court. However, an amendment by one party should not be allowed where it would result in surprise or prejudice to the other party. *DiBenedetto v. County of Du Page* (1986), 141 Ill. App. 3d 675, 491 N.E.2d 13; *Farnor v. Irmco Corp.* (1979), 73 Ill. App. 3d 851, 392 N.E.2d 591.

The record in this case reveals that the factual allegations underlying the additional affirmative defenses were well known to Chemical. At trial, Chemical acknowledged that the covenant of good faith had been part of the action *ab initio* and that the other defenses had little if any impact on the trial's outcome. Hence, Chemical's claim that it was forced to revise its trial strategy is unsupported, and the allowance of the amendment in this case was proper. Similarly, based upon our review of the record, we do not find that the trial court abused its discretion in denying Chemical's motion *in limine*.

For all of the foregoing reasons, the decision of the circuit court of Cook County is hereby affirmed in all respects.

Affirmed.

CERDA and GREIMAN, JJ., concur.