277 N.J. Super. 491 (1994)
649 A.2d 1328
NATIONAL WESTMINSTER BANK NJ F/K/A THE FIRST JERSEY NATIONAL BANK/CENTRAL, PLAINTIFF-RESPONDENT,
v.
JAMES LOMKER, WILLIAM MICHALEK, RALPH A. NUZZO AND WENDELL BREITHAUPT, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 1, 1994.
Decided November 30, 1994.
*493 Before Judges PRESSLER, CONLEY and NEWMAN.
Ernest R. Nuzzo, attorney for appellants (Mr. Nuzzo, on the brief).
Stark & Stark, attorneys for respondent (Paul J. Maselli, of counsel; Timothy P. Duggan, on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Defendants, guarantors of a defaulted real estate loan owed by their partnership entity, Viking Associates, appeal a summary judgment granted plaintiff creditor National Westminster Bank (NatWest), striking defendants' defenses and counterclaims to NatWest's suit on their guaranties and entering judgment in favor of plaintiff for $901,000 in principal, $308,512 in interest, $43,564.95 for real estate tax advances and $36,223.79 for attorney fees. Plaintiff cross-appeals the reduced attorney fee from the $250,615.38 requested. Because we think factual issues are extant concerning defendants' primary defenses and counterclaims, we reverse the grant of summary judgment. Plaintiff's cross-appeal, thus, is moot, but were it not, it clearly would be without merit and would have been disposed of pursuant to R. 2:11-3(e)(1)(E).
We need not tarry long with the specifics concerning the underlying note, mortgage and guaranties. In December 1987 NatWest executed a one-year note to Viking for $751,000. Interest was payable monthly, with the principal due December 1988. To secure the note, Viking gave a mortgage on a 35-acre industrial zoned parcel in Ewing Township that it was then developing and had been apparently since 1985. In March 1989, the note and mortgage were modified. An additional $150,000 was paid Viking and the note was increased to $901,000 payable by September 30, 1989. Personal guaranties were also required and executed by the defendant partners.
The note was not paid; Viking is in bankruptcy.[1] Default was declared and in September 1990, NatWest filed both a foreclosure *494 action and a separate law division suit against the partners on their personal guaranties. Defendants answered and counterclaimed in the latter, primarily alleging bad faith, fraud and conspiracy with respect to the collateral.
We would be less than candid were we to characterize the record presented to us, and presumably to the trial judge, as overwhelming. It consists almost entirely of the pleadings filed in this action and various pleadings filed in Viking's bankruptcy proceeding. In addition, there are two factually uninformative certifications from one of the defendant partners and a copy of a certification from a realtor that was filed in the federal proceeding. Skimpy though the record may be, when viewed indulgently in favor of the opponents of the motion, we discern the following. Viking, in its attempt to avoid the more disastrous effects of its default on the note, obtained a contract to sell the property for $1,800,000. There is some suggestion, although not clear, that Sorce was the purchaser. It is also alleged, though denied by Sorce, that Sorce was then, or thereafter became, a client of NatWest. That deal fell through. Sorce then entered into a contract with Viking for $1,350,000. That deal also fell through. Sorce asserts it was because Viking failed to satisfy certain contingencies, while defendants claim Sorce became aware of Viking's precarious position through NatWest, used that information, unjustifiably breached its contract with Viking and then *495 obtained a contract for the property through NatWest for $700,000.[2]
Defendants claim that NatWest divulged to Sorce while it was under contract with Viking "significant confidential data" which enabled Sorce to avoid its contract obligation with Viking and enter into a contract on the property with NatWest for substantially less. In opposing NatWest's motion for summary judgment and in addition to relying upon the facial appearance of something not quite right arising from the breach by Sorce of its deal with Viking and subsequent significantly lower contract with NatWest, defendants submitted the certification of Allison L. Etchells, a real estate broker who had been marketing the property on behalf of Viking. The realtor questioned the accuracy of what she asserted was a low appraisal of $900,000 on the property submitted by NatWest as part of its proposed plan of reorganization for Viking in the bankruptcy proceeding. She also said:
I have also shown this property for sale, in whole or part, to an entity identified as R.P.M. Courier on several occasions and approximately one week ago I brought the prospective purchaser to the site and requested that they execute a Letter of Intent evidencing their interest to acquire a 6 acre parcel and construct a building in excess of $40,000 [sic] square feet thereon. They refused to execute a Letter of Intent based upon advice of their counsel, who was informed by Nat West's counsel, Stark & Stark, a member of the firm not known at this time, that the Bank will take over this project in August and that they should not entertain any agreement with the Debtor-in-Possession, and further, that the Bank is having active discussions and negotiations with Sorce Realty, the present landlord of R.P.M. Courier. I have been informed that Sorce Realty is a party in an adversary proceeding in this Court affecting enforcement of Contract of Sale to acquire the entire project from the Debtor. I have also been advised that a part of the multifaceted *496 litigation in several courts, as alleged by the Debtor, is that Sorce and NatWest have been in conspiracy to deprive the Debtor of this parcel since before the filing of the Chapter 11 herein and continuing to this present date. I obviously was disappointed at the roadblocks presented in my marketing of this project, and I informed the Debtor of the negative activities I was presented in the field which certainly appear to me to be in bad faith and interference on behalf of the lender and/or their counsel.
These assertions, if true, would raise legitimate inferences of bad faith and improper interference with the collateral.
Every contract contains an implied covenant of good faith and fair dealing. Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981); Palisades Properties Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965); N.J.S.A. 12A:1-203. Good faith is defined by the Uniform Commercial Code as "honesty in fact in the conduct or transaction concerned." N.J.S.A. 12A:1-201(19). In the context of commercial loans, we have recently recognized that this good faith requirement does not impose upon a lender obligations that alter the terms of its deal or preclude it from exercising its bargained-for rights. Glenfed Financial Corp., etc. v. Penick Corp., et al., 276 N.J. Super. 163, 175, 647 A.2d 852 (App.Div. 1994) (lender's bad faith or lack of "honesty in fact" which would constitute a viable debtor's defense does not arise from lender's refusal to exercise greater forbearance). But a debtor may defend against enforcement of lender's rights where the lender has engaged in bad faith, misconduct or the like. See Ramapo Bank v. Bechtel, 224 N.J. Super. 191, 198, 539 A.2d 1276 (App.Div. 1988) (possibility of a concealed pre-transaction agreement not to pursue a co-guarantor in the event of default sufficient to overcome lender's motion for summary judgment). And see Lenape State Bank v. Winslow Corp., 216 N.J. Super. 115, 129, 523 A.2d 223 (App.Div. 1987) (claims that lender "intentionally obstructed the sale [of collateral] ... by failing to cooperate in it, and improperly administered the loan... by allowing the lessees to remain in default for over a year without notifying [the debtor] so that he could remedy the situation" were sufficient to overcome a motion for summary judgment in a suit on a guaranty). Compare Glenfed, 276 N.J. Super. at 178, *497 647 A.2d 852 ("[t]he record contains no evidence that [lender]'s refusal to grant [debtor] a more extended maturity date for the repayment of its debt was characterized by bad faith.... There is no suggestion that Glenfed was acting out of personal malice towards [the debtor] or its principals, or that it was pursuing its own economic interests unrelated to obtaining the repayment of the loan....").
Related to this obligation is the requirement that a lender not "unjustifiably impair" any collateral. N.J.S.A. 12A:3-606. See Langeveld v. L.R.Z.H. Corporation, 74 N.J. 45, 50, 376 A.2d 931 (1977); Lenape State Bank v. Winslow Corp., supra, 216 N.J. Super. at 124-25, 523 A.2d 223. Equitable in nature and characterized as "probably the most important provision in the Code to the surety [or guarantor]," the defense of impairment of collateral is available to a guarantor just as much as to the debtor. Langeveld, supra, 74 N.J. at 51-52, 376 A.2d 931. No less can be said for the defenses of lender bad faith and misconduct. See Chemical Bank v. Paul, 244 Ill. App.3d 772, 185 Ill.Dec. 302, 614 N.E.2d 436 (1993); Sprague Nat. Bank v. Dotty, 415 N.W.2d 725 (Ct.App.Minn. 1987), rev. denied (1988); Olney Savings & Loan Assn. v. Farmers Market of Odessa, Inc., 764 S.W.2d 869 (Texas Ct.App. 1989). But see Miller v. U.S. Bank of Washington, N.A., 72 Wash. App. 416, 865 P.2d 536 (1994); Idaho First Nat. Bank v. Bliss Valley Foods, Inc., 121 Idaho 266, 824 P.2d 841 (1991).
In granting the motion for summary judgment as to the defenses of bad faith and other misconduct the trial judge found no material issues of facts presented by defendants to overcome the motion. As to the defense of impairment of collateral, she concluded that the specific language of the guaranties was sufficient to waive that defense. Not only do the guaranties broadly provide for virtually unlimited power by NatWest to dispose of and deal with the collateral but they also provide that the obligations of the guarantors would not be affected and the guarantors shall not have any rights against NatWest even if Natwest "fails to preserve any rights in the Collateral or take any action whatsoever in *498 regard to the Collateral ... nor by reason of the fact that any of the Collateral may be subject to equities or defenses or claims in favor of others ... nor by reason of any deterioration, waste ... [or] ... release, in whole or in part, with or without consideration, of the Collateral...." The guaranties also provide that the guarantors "waive[s] the right to interpose counterclaims or setoffs of any kind and description in any litigation arising hereunder...."
In the context of a waiver of the defense of impairment of collateral, our Supreme Court has recognized that if such a significant defense were to be waived in a guaranty, "`it should only be by the most unequivocal language in the guaranty agreement. The right does not originate in contract, and it cannot lightly be destroyed by contract.'" Langeveld, supra, 74 N.J. at 53-54, 376 A.2d 931 (quoting D.W. Jaquays & Co. v. First Security Bank, 101 Ariz. 301, 419 P.2d 85, 89 (1966)). See Delaware Truck Sales, Inc. v. Wilson, 131 N.J. 20, 34, 618 A.2d 303 (1993). Although not addressing a waiver of the defense of bad faith and other misconduct, the principle can be no different.[3] In order to waive those lender liability defenses, a guaranty must do so expressly.
This result logically flows from the maxim strictissimi juris (according to strict law) that applies to guaranties. Max v. Schlenger, 109 N.J.L. 298, 301, 162 A. 638 (E. & A. 1932). The liability of a guarantor is measured by that of the principal, unless the agreement explicitly provides otherwise. General Electric Credit Corp. v. Castiglione, 142 N.J. Super. 90, 101, 360 A.2d 418 (Law Div. 1976). And a guarantor cannot be held liable beyond the strict terms of the guaranty. Housatonic Bank and Trust Co. v. Fleming, 234 N.J. Super. 79, 82, 560 A.2d 97 (App.Div. 1989); Garfield Trust Co. v. Teichmann, 24 N.J. Super. 519, 527, 95 A.2d *499 18 (App.Div. 1953); Smith v. Dowden, 92 N.J.L. 317, 105 A. 720 (Sup.Ct. 1919); First Bank and Trust Co. v. Siegel, 36 N.J. Super. 207, 210, 115 A.2d 152 (Cty.Ct. 1955). Moreover, guaranties are strictly construed and interpreted most strongly against the entity which has prepared the form. Housatonic Bank, supra; First New Jersey Bank v. F.L.M. Bus. Machines, Inc., 130 N.J. Super. 151, 156, 325 A.2d 843 (Law Div. 1974).
In Lenape, we construed a guaranty that was not unlike the guaranties here to constitute an "unequivocal" waiver of the defense of impairment of collateral. But we also held there that claims of wrongful and intentional interference with the collateral survived summary judgment. We did so pointing to the existence of an express provision in the guaranty discharging the guarantor's obligations where any "deterioration, waste or loss [of the collateral] is caused by the willful act or willful failure to act of Lender." Lenape, 216 N.J. Super. at 129, 523 A.2d 223. The guaranties here do not contain this language. But neither do they expressly provide to the contrary, that is the guaranties do not say that willful misconduct discharges the guarantors' obligations. And, critically, however unequivocal and unconditional, the guaranties do not expressly waive the defenses of bad faith, fraud or conspiracy. Accord Chemical Bank v. Paul, supra, 614 N.E.2d at 783. Cf. Tessler and Son, Inc. v. Sonitrol Sec. Systems of Northern New Jersey, Inc., 203 N.J. Super. 477, 483-84, 497 A.2d 530 (App.Div. 1985).
We view defendants' assertions of NatWest's conspiring and "inside" dealing with Sorce during Sorce's contractual relations with Viking and culminating in Viking's deal falling through and Sorce entering into a better deal for the same property through NatWest, to constitute the type of wrongful and intentional conduct not waived by the language in the guaranties. We acknowledge that defendants' submissions in opposition to the motion constituted little more than a regurgitation of the allegations of the pleadings and, further, that more is needed to overcome a motion for summary judgment. E.g. Optopics Laboratories Corp. *500 v. Sherman Laboratories, Inc., 261 N.J. Super. 536, 543, 619 A.2d 614 (App.Div. 1993). But it does not appear to be disputed that Sorce had a contract with Viking for $1,350,000, backed out of that deal and got itself, through NatWest, a contract for the same property for $700,000, substantially below even what NatWest's bankruptcy appraisal was and below the indebtedness on the property. These facts, coupled with the assertion in the realtor's certification provide credence to the claims of bad faith, fraud and conspiracy. Certainly NatWest's motion papers did not show "palpably the absence of any issue of material fact." Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75, 110 A.2d 24 (1954). It may be that these claims will not ultimately prevail. But they should have survived the summary judgment motion.
Reversed and remanded for further proceedings.
NOTES
[1] We reject defendants' contention that the automatic stay provision of 11 U.S.C.A. § 362(a) extends to NatWest's suit against the individual guarantors. See Seaboard Surety v. Board of Chosen Freeholders, 222 N.J. Super. 409, 415, 537 A.2d 310 (App.Div.), certif. denied, 111 N.J. 630, 546 A.2d 545 (1988) ("[t]he law is well settled that the automatic stay provided for by the bankruptcy law extends only to claims against the debtor himself and not against others, including sureties, whose liability to the creditor for the obligations of the debtor has an independent basis."). Defendants' suggestion that Seaboard does not apply to a creditor's action against a guarantor is misplaced. See our discussion of Salitan v. Magnus, 62 N.J. Super. 323, 162 A.2d 883 (App.Div.), certif. denied, 33 N.J. 388, 164 A.2d 850 (1960) at 222 N.J. Super. 416-17, 537 A.2d 310. Accord Citizens First National Bank of New Jersey v. Marcus, 253 N.J. Super. 1, 3-5, 6, 600 A.2d 943 (App.Div. 1991).
[2] In the bankruptcy proceeding, Sorce filed an adversary complaint against Viking seeking the return of its $100,000 deposit on the $1,350,000 contract. Defendants answered and counterclaimed, alleging a breach of contract and raising claims similar to those it makes here. Defendants additionally have filed an adversary complaint against NatWest also raising the same type of claims. We have not been advised of the status of these obviously related matters. Defendants contend that the entire controversy doctrine bars NatWest's state proceedings. However, no motion was made below to dismiss or for other relief on that basis. We, thus, do not consider that issue in the context of this appeal. E.g. State v. Churchdale Leasing, Inc., 115 N.J. 83, 100, 557 A.2d 277 (1989); Neider v. Royal Indemnity Insurance Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
[3] The parties have not addressed whether such defenses, as a matter of public policy, can be waived. Because we have concluded that the guaranties here do not do so explicitly, we need not address that issue and express no view upon it.